Filed 4/30/13  In re J.B. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re J.B. et al., Persons Coming Under the Juvenile Court Law.

|  |  |
|---|---|
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E056719 |
| Plaintiff and Respondent, | (Super.Ct.No. J240536 & J240537) |
| v. | OPINION |
| A.R., |  |
| Defendant and Appellant. |  |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Kristina M. Robb, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

The juvenile court (1) denied A.R.'s (Grandmother) request to change a court order (Welf. & Inst. Code, § 388),[1] concerning two of her grandsons, J.E.B. (J.E.) and J.T.B. (J.T.) (minors). Grandmother contends (1) the juvenile court erred by summarily denying her request to change a court order because Grandmother made a prima facie case that (a) her circumstances had changed, and (b) the changed order would be in minors' best interests; (2) the juvenile court erred by engaging in the statutory two-prong analysis despite the summary denial; (3) the juvenile court violated her due process rights by denying her request at an ex parte hearing; and (4) the juvenile court erred by not placing minors in Grandmother's care because she is entitled to relative placement preference. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

A.      FIRST DETENTION

J.E. is a male who was born in October 2004. J.T. is a male who was born in September 2005. The Los Angeles County Department of Children and Family Services (DCFS) filed a petition on December 31, 2008, alleging (1) minors' mother, A.V. (Mother), created a dangerous home environment for minors by leaving methamphetamine, two syringes, and a drug pipe within minors' reach; (2) on December 28, 2008, Mother was arrested for possessing drug paraphernalia and being under the influence; (3) Mother was an active user of methamphetamine and used the drug while minors were in her care; and (4) minors' father, J.B. (Father) was an active

_____

[1] All subsequent statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

2

user of methamphetamine. DCFS alleged Mother and Father failed to protect minors. (§ 300, subd. (b).)

Minors have two half siblings, R.R. and J.R. Grandmother was the legal guardian of R.R. and J.R., via probate court, and they resided in Grandmother's home. DCFS contacted Grandmother and she expressed interest in having custody of J.E. and J.T. DCFS concluded Grandmother did not qualify for placement of minors due to her criminal history and because she would have four children sleeping in one bedroom. Grandmother said her criminal history included (1) an arrest for drug possession in approximately 1997; and (2) an arrest for assault with a deadly weapon in 2008. Grandmother explained that she assaulted Mother's ex-boyfriend with a knife when she saw him choking and punching Mother. Grandmother protected Mother by chasing the ex-boyfriend away with the knife. According to Grandmother, the charges against her were dropped.

Minors were placed in foster care. The Los Angeles County Juvenile Court found DCFS made a prima facie case for needing to remove minors from Mother's and Father's care. The court vested physical custody of minors in DCFS. The court granted Grandmother supervised visits with minors a minimum of three times per week.

B. FIRST JURISDICTION AND DISPOSITION

Minors continued residing together in a foster home. The Los Angeles County Juvenile Court found true the allegations in the petition, which are set forth *ante*. Thus, the court found minors came within section 300, subdivision (b) and declared minors to be dependents of the court. The court ordered minors removed from Mother's custody.

The court asked what the issues were in regard to placing minors in Grandmother's care. Minors' attorney responded that Grandmother was found to have a "nonexemptable offense," which meant minors could not reside with her. Minors' attorney commented that the lack of exemption was "a little puzzling, because the other two children are with her." The juvenile court explained the problem may have arisen due to the placement laws changing or due to probate court having different requirements than juvenile court. Minors' counsel advised Grandmother that she could appeal the denial of the exemption. The court ordered DCFS "to continue to work on the criminal waiver for the grandmother." The court allowed Grandmother to continue having visitation with minors.

C.     REVIEW HEARINGS

Mother was living at an inpatient substance abuse treatment center. Minors were living with Mother at the treatment center. On February 26, 2010, the Los Angeles County Juvenile Court ordered minors continue to be placed with Mother on a plan of family maintenance services.

In June 2010, Mother and minors moved out of the treatment center and into a sober living apartment in Montclair. Mother was forced to move out of the treatment center because of J.T.'s destructive behavior. J.T. hit other children and broke a toilet, among other things. Mother was employed at a fast-food restaurant and appeared to be complying with the case plan. Father showed no interest in reunifying with minors. On August 27, 2010, the Los Angeles County Juvenile Court ordered minors continue to be placed in Mother's care. The court ordered a plan of family preservation.

4

J.T.'s destructive behavior continued. From September to December 2010, J.T. was not allowed to attend school unless Mother sat with him in class, which resulted in J.T. only attending school two hours per day due to Mother's work schedule. While at school, J.T. threatened students, went through his teacher's purse, and struck the principal. J.E. appeared happy and said he enjoyed living with Mother. On February 25, 2011, the Los Angeles County Juvenile Court ordered the children continue to be placed with Mother and continue on a plan of family preservation. The court ordered therapeutic behavior services for minors.

D.     SECOND DETENTION

In May 2011, DCFS filed a subsequent petition (§ 342) alleging (1) minors were at risk of serious physical harm due to Mother and her ex-boyfriend (Joseph) engaging in domestic violence (§ 300, subd. (a)); (2) Mother failed to protect minors when Joseph physically abused minors (§ 300, subd. (b)); (3) Mother failed to protect minors when she and Joseph engaged in domestic violence (§ 300, subd. (b)); and (4) Mother failed to protect minors and provide for their support when she left minors with caretakers and then disappeared for a period of time (§ 300, subds. (b) & (g)).

Minors said they wanted to live with Grandmother. Minors did not want to live with Mother because she hit them. On May 13, 2011, the Los Angeles County Juvenile Court ordered minors continue to be detained. Minors were placed with Grandmother.

E.     SECOND JURISDICTION AND DISPOSITION

Minors lived with Grandmother. On June 8, 2011, a pretrial resolution conference was held, but the disposition issues were not resolved. At the hearing,

5

Mother's attorney stated that she spoke to minors' therapist who believed minors should be removed from Grandmother's home because the home was contrary to minors' well-being. The Los Angeles County Juvenile Court ordered DCFS "to look into re-placing the [minors] if necessary."

A jurisdiction hearing took place on July 13, 2011. J.E. testified at the hearing. J.E. described seeing Mother fight with Joseph. Joseph held what J.E. believed to be a toy gun to Mother's head. J.E. smacked Joseph in order to protect Mother. Joseph pushed J.E., causing him to fall and hit his head. Mother witnesses Joseph push J.E., but she did not say or do anything to respond.

J.T.'s therapist testified at the hearing. J.T. displayed aggressive behavior and had impulse control problems. The therapist further testified that during a visit with minors' half sibling, R.R., R.R. asked a DCFS employee, "'Why does my mom hit me?'" The therapist was not sure who R.R. was referring to as "mom."

The Los Angeles County Juvenile Court found there was not enough evidence to support the allegations in DCFS's subsequent petition. However, the court did not return minors to Mother. The court ordered DCFS to assess Mother's new home in Upland, as well as her relationship with minors. The court scheduled a progress hearing within one week's time.

After the hearing, Grandmother switched J.T. to a new therapist. The court ordered J.T. be switched back to the therapist that testified at the jurisdiction hearing. After a continuance, the progress hearing took place on July 29, 2011. Mother's home was approved by DCFS. The court placed minors in Mother's care.

6

F.    STATUS REVIEW HEARING

J.E. displayed defiant, angry, and anxious behaviors.  DCFS referred J.E. for a mental health assessment because it appeared he "would benefit from intensive mental health services."  J.E. ignored Grandmother as an authority figure.  J.T. was also displaying angry and anxious behaviors.  According to Grandmother, J.T. would bang his head "against 'anything'" when he was upset.

A status review hearing took place in Los Angeles County on August 19, 2011. The court ordered the case be transferred to San Bernardino County and "highly" recommended San Bernardino County place the family on a plan of family preservation. The San Bernardino County Juvenile Court accepted the case transfer.

G.    THIRD DETENTION

On December 6, 2011, San Bernardino County Children and Family Services (the Department) filed an amended petition for J.T. alleging:  (1) Mother failed to ensure minors attended school on a regular basis (§ 300, subd. (b)); (2) Mother continued abusing drugs, which hindered her ability to care for J.T. (§ 300, subd. (b)); (3) Mother did not supervise J.E., and he stuck himself with a dirty hypodermic needle, which created a substantial risk of J.T. being similarly neglected (§ 300, subd. (j)); and (4) Mother failed to obtain the recommended medical treatment for J.E.'s needle puncture, which created a substantial risk of J.T. being similarly neglected (§ 300, subd. (j)).  The Department also filed an amended petition for J.E.  All the allegations listed *ante*, were included in J.E.'s petition, but they all fell under section 300, subdivision (b), because J.E. was a direct victim in all the allegations.

7

Mother did not provide the Department with "sufficient information regarding relatives for placement consideration." The Department detained minors and placed them in a foster home. The San Bernardino County Juvenile Court found the Department made a prima facie case that minors came within section 300, and ordered minors removed from Mother's care and placed in the Department's custody.

H.    THIRD JURISDICTION AND DISPOSITION

Mother disclosed to the Department that she had a child welfare history while a child in Grandmother's home, because Grandmother abused Mother. Mother also stated that she was repeatedly raped by Grandmother's boyfriend when she was a child, but Grandmother did not believe Mother's allegations. Mother explained that her first child, J.R. was a result of the rapes by Grandmother's boyfriend. Mother's first two children, J.R. and R.R., were born while Mother was in high school. Mother began abusing heroin at age 12.

The juvenile court found true the allegations in the petitions. In regard to disposition, Mother objected to the Department's recommendation that services be denied. Mother conceded she exceeded the statutory timeframe for reunification services, but asserted she was actively engaged in services. Mother argued that allowing her to complete her services would be in minors' best interests. The juvenile court found Mother was "out of statutory time" for reunification services. The juvenile court terminated Mother's reunification services.

The Department asked the court for permission to list minors on an adoption website, in order to find an adoptive home for minors. The court responded,

8

"Al[r]ight." Mother's attorney asked the Department to speak to Mother about any relatives or non-related extended family members that Mother would like assessed for adoption. Mother's attorney suggested Mother's friend, A.G., as a potential adoptive parent. The Department requested Mother give the relative and friend information to the Department that same day.

I.      IDENTIFYING A PROSPECTIVE ADOPTIVE FAMILY

On March 14, 2012, minors were presented to a prospective adoptive family, who accepted minors for adoption. The Department began arranging visitation between minors and the adoptive family in order to create a smooth transition into the adoptive family's home. The Department asked the court to reduce Mother's two-hour weekly visits with minors, because the visits were confusing to minors given that they were being prepared for adoption. On April 17, 2012, the juvenile court ordered that Mother's visits with minors be reduced to two-hour visits every other week.

That same day, April 17, Grandmother contacted the Department, after Mother spoke to Grandmother. Grandmother said she last saw minors in July 2011. Grandmother told the Department social worker she had been unaware minors were again removed from Mother's care and asked why minors were not placed in her custody. The social worker explained minors were not placed with Grandmother due to Grandmother's history with DCFS, reports that Mother was raped by Grandmother's boyfriend, and reports that Grandmother's boyfriend fathered J.R. Grandmother denied the allegations and accused Mother of being dishonest; however, Grandmother admitted her ex-boyfriend molested Mother when Mother was seven years old.

9

A Department social worker visited Grandmother's home on May 1, 2012. Grandmother had four adults and two children residing in her three bedroom, one bathroom apartment: (1) Grandmother, (2) Grandmother's boyfriend, (3) Grandmother's two adult sons, (4) Grandmother's daughter, M., who was born in 2010, and (5) R.R. J.R. left Grandmother's home in September 2011 to live with his father in Tennessee. R.R. was in therapy for depression.

On May 2, 2012, minors were asked where they would like to live. Grandmother's home was among their top choices. Minors appeared attached to Mother, Grandmother, and R.R. Grandmother told the Department she wanted minors placed with her. The Department referred Grandmother to the Relative Assessment Unit. The four adults in Grandmother's home needed to complete background checks.

When the non-related prospective adoptive family learned that Grandmother wanted minors placed with her, the non-related prospective adoptive family decided to stop pursuing the adoption of minors. The Relative Assessment Unit denied Grandmother as a possible placement for minors due to Grandmother's "'extensive substantiated child welfare history.'"

Grandmother's child welfare history included: (1) An unfounded allegation of physical abuse by Grandmother on R.R. on June 16, 2011—R.R had been placed on a time out and attempted to hang himself in a closet, he was found by a half sibling; (2) an unfounded allegation of physical abuse by R.R.'s great-grandmother on R.R. on August 14, 2008—the great-grandmother allegedly hit R.R. on the head with a telephone receiver during an argument; (3) an inconclusive allegation of emotional abuse by

Grandmother on minors on August 1, 2008—Grandmother stabbed Mother's ex-boyfriend but denied minors were present during the stabbing; (4) an unfounded allegation of physical abuse by Grandmother on R.R. on September 27, 2007—Grandmother allegedly hit R.R. with a belt; (5) an unfounded allegation of substantial risk posed by Grandmother and an uncle to minors on September 24, 2007—minors were allegedly hit by Grandmother and an uncle; (6) an unfounded allegation of general neglect by Grandmother to J.L. on March 20, 2006—J.L. was determined to be a danger to himself or others (§ 5150); (7) a substantiated allegation of general neglect by Grandmother involving R.R. and J.R. on February 28, 2006; (8) a substantiated allegation of an uncle, who lived with Grandmother, posing a substantial risk to R.R. and J.R. on February 28, 2006; (9) an inconclusive allegation of physical abuse by Grandmother involving C.V., Grandmother's daughter, on January 20, 2004—Grandmother allegedly hit C.V. with a broomstick causing bruises; (10) an inconclusive allegation of general neglect by the maternal great-grandmother involving R.R. and J.R. on March 25, 2003—R.R. and J.R. were allegedly left outside, across the street, unsupervised while Grandmother cleaned her house; (11) a substantiated allegation of general neglect by Grandmother involving R.R. on July 28, 2001—R.R. left Grandmother's yard through an unlocked gate, and Grandmother filed a missing persons report; (12) a substantiated allegation of physical and emotional abuse by Grandmother involving Mother on June 26, 2001—Grandmother hit Mother's back and slapped her face; (13) an inconclusive allegation of Mother's brother sexual abusing Mother on April 5, 2001; (14) a substantiated allegation of Grandmother's absence or incapacity as

a caretaker with Mother as a victim on September 27, 1999—Grandmother did not want Mother to live at home; and (15) a substantiated allegation of Grandmother physically abusing Mother on September 21, 1999—Grandmother was throwing objects at the children.

A jurisdiction reported dated November 10, 1999, reflected Grandmother allowed gang members and drug users in her home. Grandmother admitted slapping Mother when Mother remarked about calling the police. Grandmother's daughter, R., who was eight years old, reported that Mother would shake R.R. when he was a baby and throw him on the floor because he vomited. Grandmother would then tell DCFS that Mother was "'a good mother'" who was scared by R.R. vomiting.

A jurisdiction report dated March 21, 2006, reflected Grandmother had two open cases with the juvenile court involving Mother and her siblings. Mother and her siblings were twice removed from Grandmother's care due to Grandmother's heroin abuse and because Grandmother was allowing drug users and gang members in the home. DCFS did not permit Grandmother to have custody of R.R., so Grandmother obtained legal guardianship through the probate court.

A jurisdiction report dated January 30, 2009, reflected Grandmother had 22 child welfare referrals and Grandmother was on a voluntary family maintenance plan for R.R. and J.R., minors' half siblings. Grandmother also disclosed to DCFS that she knew (1) minors were living in Mother's home, which was dirty and had roaches; (2) minors were being hit by Mother's boyfriend; and (3) Mother was using drugs. Despite this

12

knowledge, Grandmother did nothing to assist minors. In that report, DCFS concluded it could not recommend placing minors in Grandmother's care.

Additionally, Grandmother's criminal history reflected a dismissed charge of assault with a deadly weapon other than a firearm on July 16, 2008, and a charge of child cruelty involving possible injury or death on March 31, 1997. The disposition was not known for the child cruelty charge. The Department concluded that based upon Grandmother's criminal history and child welfare history it would be risky to place minors in her care.

As of May 16, 2012, minors were still residing in their foster home, so that they could finish the school year before being moved to a prospective adoptive home. Minors had issues with not telling the truth and needing to be redirected by their foster parents. J.T. hit and punched other students during recess at school. In one incident, J.T. took another student's hearing aid, threw it on the ground causing the battery to be lost, and showed no remorse for the incident. In a second incident, J.T. drew a picture of a female student, placed the picture in front of his genitals, and made thrusting motions. J.E. was beginning to have behavioral problems at school.

On May 30, 2012, the juvenile court ordered the Department to facilitate visits between minors and relatives, "as appropriate"; Mother's visitation with minors remained unchanged. The Department scheduled a supervised visit between Grandmother and minors. Minors seemed more excited about seeing R.R. than seeing Grandmother. A Department employee asked minors how they felt about the idea of living with Grandmother. J.E. responded that he would not feel safe living with

13

Grandmother. J.T. said he did not want to live with Grandmother "'because she doesn't let us go into the refrigerator.'"

J.       REQUEST TO CHANGE A COURT ORDER AND REQUEST FOR
DE FACTO PARENT STATUS

Minors were matched to a second prospective adoptive family on June 6, 2012. On June 25, minors told a Department social worker that they liked the second prospective adoptive family and wanted to live with them. On their own, minors began referring to the prospective adoptive parents as "'mommy'" and "'daddy.'" The social worker asked minors where they would like to live and they responded that they would like to live with the prospective adoptive family.

On June 20, 2012, Grandmother filed a request to change a court order. Grandmother asserted the juvenile court order terminating Mother's reunification services and ordering adoption planning needed to be changed because Grandmother was not notified of minors' detention and she had been a caregiver for minors in Los Angeles County. Grandmother asked the juvenile court to place minors in her care or grant her overnight weekend visits with minors. Grandmother asserted the changed orders would be in minors' best interests because (1) minors had previously lived with Grandmother; and (2) minors could spend time with their two half brothers.

Also on June 20, 2012, Grandmother filed a request to be designated minors' de facto parent. Grandmother asserted the request should be granted because (1) minors were bonded to Grandmother; (2) Grandmother had provided daily care for minors; and (3) minors said they wanted to live with Grandmother.

14

The Department responded to Grandmother's requests. The Department explained that Grandmother was not originally considered as a placement for minors because Mother did not want Grandmother "involved at all." Mother gave the social worker the names and contact information for other relatives, but not for Grandmother. The social worker excluded Grandmother as a possible placement due to reports by DCFS.

The juvenile court ordered a hearing on Grandmother's request to change a court order. Grandmother's requests were scheduled to be heard on July 2, 2012. On July 2, Grandmother informed the court that her attorney was unaware of the hearing. As a result, the court rescheduled the hearing for July 12, 2012. As of July 12, minors were still residing in their foster home.

On July 12, the juvenile court held a hearing on the termination of Mother's parental rights, Grandmother's request to change a court order, and Grandmother's request for de facto parent status. Grandmother's attorney asked the juvenile court to continue the hearing on Grandmother's requests, because Grandmother was awaiting a decision on her appeal of the Relative Assessment Unit's decision excluding her home as possible placement for minors. The juvenile court denied the request for a continuance reasoning that the determination from the Unit would not be binding on the court and the court had other matters to consider, such as minors' best interests.

The juvenile court said it would begin with Grandmother's request to change a court order. Grandmother's attorney said he wanted to call Mother as a witness. Minors' counsel remarked that the court was not conducting an evidentiary hearing.

15

The court concluded minors' counsel was correct, because the court needed to decide if Grandmother made a prima facie case before conducting an evidentiary hearing. Grandmother's attorney responded, "No problem, your Honor."

Grandmother's counsel argued that Grandmother was approved for placement by DCFS, and Grandmother had been unaware of minors' most recent detention until April 2012. In regard to Grandmother's history of child welfare referrals, Grandmother's attorney pointed out that there were "only four actual substantiated referrals." Grandmother's attorney argued that Grandmother suffered from a heroin addiction, but had been sober for 15 years. Additionally, the attorney pointed-out that Grandmother reunited with her children when they were removed by DCFS. Grandmother's attorney asserted it was in minors' best interests to be placed with a relative, and Grandmother was willing to adopt minors.

Minors' counsel argued Grandmother failed to present a prima facie case. Minors' counsel argued Grandmother's request to change a court order contained incongruous arguments, in that Grandmother wrote that she wanted the orders changed relating to (1) the termination of Mother's reunification services, and (2) finding a suitable placement for minors and making adoption plans. Minors' counsel asserted the juvenile court had not yet ordered adoption as minors' permanent plan and Grandmother did not have standing to ask for a change concerning Mother's services. Minors' counsel stated she was confused by "what the changed circumstances are," because the juvenile court had not yet decided the issue.

16

Minors' counsel further argued that the requested change would not be in minors' best interests because Grandmother had an "extensive" child welfare history, a history of drug abuse, and a criminal history. Minors' counsel argued that Grandmother's home was unstable.

The Department argued that Grandmother failed to make a prima facie case because nothing would change the fact that Grandmother had dependency cases involving her own children, and that a court removed Grandmother's children from her due to serious allegations. The juvenile court found Grandmother had not made a prima facie case for a change of circumstances and also found that the requested change would not be in minors' best interests given Grandmother's history of child welfare referrals. The juvenile court denied Grandmother's request for de facto parent status, because Grandmother had not lived with minors since June 2011. The court continued the hearing concerning the termination of Mother's parental rights.

## K. TERMINATION

Minors moved into the home of their prospective adoptive parents. Minors continued to say they wanted to live with the prospective adoptive parents. Minors did not have behavioral problems at home; however, they were still aggressive at school. Both minors were twice suspended from school within the first month of classes beginning in fall 2012. On September 21, 2012, the juvenile court terminated Mother's and Father's parental rights to minors. The court ordered adoption as minors' permanent plans.

## DISCUSSION

A.     <u>SUMMARY DENIAL OF THE REQUEST TO CHANGE A COURT ORDER</u>

Grandmother contends the juvenile court erred by summarily denying her request to change a court order. We disagree.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child. [Citation.]" (*In re A.A.* (2012) 203 Cal.App.4th 597, 611 [Fourth Dist., Div. Two].) "Unless the moving party makes a prima facie showing of both elements, the petition may [be] denied without an evidentiary hearing. [Citation.]" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.) "Prima facie" showing means Grandmother needed to show she would prevail on the request, i.e., she would only lose if contrary evidence were produced at the evidentiary hearing. (*People v. Skiles* (2011) 51 Cal.4th 1178, 1186; *In re Aaron R.* (2005) 130 Cal.App.4th 697, 705.)

"The petition for modification must contain a 'concise statement of any change of circumstance or new evidence that requires changing the [previous] order.' [Citation.] The petition must be liberally construed in favor of its sufficiency. [Citations.]" (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.)

"'We review the juvenile court's summary denial of a section 388 petition for abuse of discretion.' [Citation.]" (*In re Aaron R.*, *supra*, 130 Cal.App.4th at p. 705.) "An abuse of discretion occurs when the juvenile court has exceeded the bounds of

reason by making an arbitrary, capricious or patently absurd determination." (*In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 642.)

In Grandmother's request to change a court order, she indicated that she wanted the court's orders changed concerning (1) the termination of Mother's reunification services, and (2) moving minors into a suitable placement and going forward with adoption planning. At the time Grandmother filed her request to change a court order, the only orders the court made related to adoption were (1) ordering that Mother's visits with minors be reduced to two-hour visits every other week; and (2) appearing to give the Department permission to list minors on an adoption website, in order to find an adoptive home for minors.

Grandmother does not have standing to address the issues concerning Mother's visitation schedule and Mother's reunification services because Grandmother's personal interests are not affected by these orders. (*In re J.T.* (2011) 195 Cal.App.4th 707, 719.) Thus, we will infer that Grandmother's request to change a court order concerns the court's apparent order granting the Department permission to list the children on an adoption website.

The record reflects the court granted the Department permission on January 31, 2012. On March 14, 2012, minors were presented to a prospective adoptive family, who accepted minors for adoption. The Department began arranging visitation between minors and the adoptive family, in order to create a smooth transition into the adoptive family's home. When that prospective adoptive family learned about Grandmother, they decided not to pursue the adoptions. Minors were matched with a second

19

prospective adoptive family on June 6, 2012. Grandmother filed her request to change a court order on June 20, 2012.

By the time Grandmother filed her request, the court's order had already been carried out. Minors had been matched with prospective adoptive parents. Thus, any request to change the order related to listing minors on an adoption website was moot because changing the court order would have made no difference, in that the order was already completed. (*In re Albert G.* (2003) 113 Cal.App.4th 132, 135 [if no relief can be granted, the issue is moot].)

Since Grandmother lacked standing to raise the issues related to Mother, and the issue concerning listing minors on an adoption website was moot by the time Grandmother filed her request, we conclude the juvenile court acted within its discretion in summarily denying Grandmother's request to change a court order.

Grandmother asserts, "The fact a relative with an approved placement petition was ready willing and able to care for both children and maintain their relationship with siblings was sufficient new information that if credited would be in the [minors'] best interests." Grandmother's argument is problematic because San Bernardino County did not approve her home for placement of minors due to Grandmother's "'extensive substantiated child welfare history.'"[2] Thus, Grandmother was not "a relative with an approved placement," as she asserts.

----

[2] To the extent Grandmother's argument is meant to relate to Los Angeles County, on July 3, 2012, a Los Angeles County social worker said Grandmother's home
*[footnote continued on next page]*

20

Next, Grandmother cites a letter from the regional administrator of DCFS and asserts, "The letter alone was a compelling piece of information if credited would achieve a prima facie showing entitling maternal grandmother to a hearing on her [section] 388 petition." The record citation Grandmother provides is not to a letter; rather, it is to a "Notice to Reporter to Prepare Transcript on Appeal." Nevertheless, assuming there is a letter supporting Grandmother's position, the problem remains that Grandmother lacks standing concerning two of the orders and the third order was moot. As a result, the juvenile court acted reasonably in summarily denying Grandmother's request.

Grandmother contends the juvenile court erred by summarily denying her request because it was not clear what court order Grandmother wanted changed; Grandmother asserts the order she wanted changed was the order placing minors in foster care, because she wanted the children placed in her home. Grandmother's argument that she merely wanted to change minors' foster home is problematic because the court typically does not order a minor to be placed in a particular home. Rather, as here, the court orders the Department to take custody of the minor, and then the Department decides where to place the child. (*In re Cynthia C.* (1997) 58 Cal.App.4th 1479, 1490 [social worker had no duty to obtain a court order to move a child to a different foster home]; § 16514, subd. (c) [social worker decides if the foster home meets the child's needs];

[footnote continued from previous page]
"was not the best placement for [minors]" and she "would be hesitant to place the [minors] back with [Grandmother]."

21

§ 366.26, subd. (j) [the child welfare agency has "the exclusive care and control of the child at all times until a petition for adoption . . . is granted"].)

In another argument, Grandmother contends the juvenile court could have changed its custody order and then ordered the Department to place minors in Grandmother's home. The problem here is that Grandmother did not indicate she wanted a change of custody while at the juvenile court.

Since Grandmother has tried to raise the placement issue in two different arguments, for the sake of thoroughness, we will address the merits of the placement (but not custody) issue since it was discussed to a certain extent at the juvenile court. As explained *ante*, a juvenile court typically does not make placement orders. Nevertheless, assuming the juvenile court did make placement orders, it is unclear how the court could have ordered minors placed in Grandmother's home because there is nothing indicating that her home is approved for placement. As Grandmother's attorney said at the hearing on the section 388 request, Grandmother was still in the process of appealing the denial of her home as a possible placement. Since there was nothing indicating Grandmother's home was approved by San Bernardino County as a placement option, the juvenile court acted reasonably in summarily denying Grandmother's request.

Grandmother asserts she made a prima facie case of changed circumstances, and that the changed order would be in minors' best interests. We do not address these arguments because Grandmother has not shown she has standing to address Mother's reunification and visitation issues; the adoption website issue was moot; a placement

22

order was not previously made by the court, because placement was decided by the Department; Grandmother did not raise the issue concerning the custody order while at the juvenile court; and Grandmother did not show that her home was approved for placement even if the placement and custody issues were otherwise viable. Since the request could be summarily denied on the forgoing bases, without delving into the issues of changed circumstances and best interests, we do not address Grandmother's arguments concerning changed circumstances and best interests.

B. CONSIDERING THE MERITS OF THE REQUEST TO CHANGE A COURT ORDER

Grandmother contends the juvenile court erred by finding the request to change a court order was not set for an evidentiary hearing but then "engag[ing] in the statutory two prong analysis." We disagree.

As explained *ante*, "[a] juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child. [Citation.]" (*In re A.A.*, *supra*, 203 Cal.App.4th at p. 611.) "Unless the moving party makes a prima facie showing of both elements, the petition may [be] denied without an evidentiary hearing. [Citation.]" (*In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 642.) "Prima facie" showing means Grandmother needed to show she would prevail on the request—she would lose only if contrary evidence were produced at the evidentiary hearing. (*People v. Skiles*, *supra*, 51 Cal.4th at p. 1186; *In re Aaron R.*, *supra*, 130 Cal.App.4th at p. 705.)

In order for the juvenile court to determine if Grandmother made a prima facie case on the two required elements, the court needed to engage in the two-prong analysis. It is clear from the juvenile court's analysis that it was considering only the showing presented by Grandmother—it was not considering contradictory evidence. For example, the juvenile court said, "So the Court does not find that there is a change of circumstances that has been suggested by the grandmother . . . ." The juvenile court was only considering whether Grandmother made a prima facie showing under the two required elements. As a result, we conclude the juvenile court did not err.

C.    EX PARTE DENIAL

Grandmother contends the juvenile court erred because "[t]he ex parte denial of the petition denied maternal grandmother her due process right to a hearing on the merits." "Ex parte" means only one party is present during the denial of the petition. (*Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 56, fn. 1 (conc. & dis. opn. of Kennard, J.).) When Grandmother's request was denied, the following attorneys were present: (1) Minors' counsel; (2) Mother's attorney; (3) Father's attorney; (4) Grandmother's attorney; and (5) the Department's attorney. Since all the parties were present, we conclude there was not an improper ex parte denial of Grandmother's petition.

D.    PREFERRED PLACEMENT

Grandmother contends the juvenile court erred by not placing minors in her home, regardless of her request to change a court order, because when a new placement

is necessary, relatives are entitled to placement preference. We conclude the court did not err.

After a disposition hearing, "whenever a new placement of [a] child must be made, consideration for placement shall again be given . . . to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements." (§ 361.3, subd. (d).) The juvenile court reviews an agency's placement decision under the abuse of discretion standard of review. (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 44.) The appellate court also applies the abuse of discretion standard of review. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

Grandmother told the Department she wanted custody of minors on April 17, 2012. On that day, the social worker explained Grandmother had not been contacted about placement of minors due to Grandmother's history with DCFS, reports that Mother was raped by Grandmother's boyfriend, and reports that Grandmother's boyfriend fathered J.R. Thus, it appears from this evidence Grandmother was initially considered for placement but was excluded because she was found to be unsuitable.

Grandmother denied the various allegations against her, so the Department referred Grandmother to the Relative Assessment Unit. A Department social worker visited Grandmother's home on May 1, 2012. There were four adults in Grandmother's home that needed to complete background checks. Ultimately, the Relative Assessment Unit denied Grandmother as a possible placement for minors due to Grandmother's "'extensive substantiated child welfare history.'" This evidence reflects Grandmother was considered for placement as required by section 361.3, subdivision (d); however,

she was found to be unsuitable, and therefore minors could not be placed with her pursuant to section 361.3, subdivision (d).  Since it appears from the evidence that the Department complied with the law by considering Grandmother for a possible placement, we conclude there was not an abuse of discretion.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
                                                                                    J.

We concur:

KING
            Acting P. J.

CODRINGTON
                        J.