[No. C065273. Third Dist. May 17, 2011.]

In re J.T., a Person Coming Under the Juvenile Court Law.
SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN
SERVICES, Plaintiff and Respondent, v.
J.B., Defendant and Appellant;
L.S., Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II, III, IV and V.

**COUNSEL**

Nicole Williams for Appellant.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

Robert A. Ryan, Jr., and Jason A. Manoogian for Plaintiff and Respondent.

**OPINION**

**DUARTE, J.**—The mother, Jacqueline B. (mother) and sister, LaR.S. (sister) of J.T. (the minor), appeal from the juvenile court's order terminating mother's parental rights. (Welf. & Inst. Code,[1] §§ 366.26, 395.)

Mother contends that (1) the juvenile court erred in finding the minor adoptable; (2) the beneficial parental relationship exception to adoption applied; (3) the sibling relationship exception to adoption applied; and (4) guardianship, rather than adoption, was the preferred permanent plan.

Sister contends that (1) the juvenile court erred in failing to determine the minor's wishes before terminating parental rights; and (2) the juvenile court failed to consider whether the current caregivers were able to provide for the minor's needs. Sister also joined in mother's arguments. Mother adopted sister's arguments by reference in her reply brief.

We raised sua sponte the issue of sister's standing to be heard on her claims and ordered supplemental briefing on that issue.

Because we conclude that sister lacks standing, as we explain *post*, we shall dismiss sister's appeal.

As we disagree with each of the contentions summarized above, we shall affirm the juvenile court's order terminating mother's parental rights.

## FACTUAL AND PROCEDURAL HISTORY

Mother's history with the Sacramento County Department of Health and Human Services (Department) dated from 1992, and included claims of general neglect, substance abuse, emotional abuse, and physical abuse. With respect to the minor, born in 1999, that history began in 2000 and included substantiated allegations of severe neglect, emotional abuse and caretaker absence or incapacity. Over the years, mother was offered various periods of reunification services, including parenting education and drug rehabilitation. However, she was never able to follow through with the services.

In February 2006, mother was placed on a section 5150 hold. She had a history of unaddressed mental health problems which included paranoia, such as believing her daughters were part of the FBI and that the FBI, the Mafia and the Devil were joined in a conspiracy against her. Mother had previously been diagnosed with schizophrenia and prescribed medications, but had not

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

taken those medications for years. After examination, mother was diagnosed with paranoid schizophrenia, bipolar disorder not otherwise specified, and psychosis not otherwise specified. Upon her release from the psychiatric hospital, mother refused to sign up for an aftercare plan.

The minor had been diagnosed as having attention deficit hyperactivity disorder (ADHD), extreme mood swings and aggressiveness. His fine motor skills were also delayed. The minor, age six, and his sisters,[2] were detained and placed together in a foster home.

The minor's paternal aunt, B.T., was assessed for placement. She had known him since birth and he would regularly spend weekends with her. She was aware of his behavioral and educational needs. She was willing to provide him a permanent home through either adoption or guardianship.

Despite mother's past failures with regard to reunification services and her ineligibility for those services under section 361.5, subdivision (b)(10) and (13), the social worker recommended she receive reunification services. The social worker noted there was a significant bond between the children and mother and that given the minor's special needs, it would be detrimental not to offer services.

Following a contested jurisdictional/dispositional hearing, the juvenile court adjudged the minor and his sisters dependents and ordered reunification services for mother.

The minor was in a special education program and adjusting well. There was a noticeable improvement in his behavior. However, he continued to resist guidance from his foster mother. Ultimately, after living in numerous foster placements because of his challenging and erratic behavior, he was placed in a group home. The minor was diagnosed as emotionally disturbed and had significant behavioral issues.

Mother was slow to progress in reunification services. She was inconsistent with drug testing and counseling appointments. Mother and the minor had consistent weekly visits, including unsupervised visits. The visits went well, but given the minor's emotional state upon return, overnight visits were not recommended. The minor visited with his sisters at the same time. The minor generally did better at the visits when his sisters were not there. He was visiting B.T. on weekends; during a 2007 visit with her, he was improperly

---

[2] Our periodic reference to "sisters" includes appellant LaR.S. as well as an older sibling, LaD.S., who is not a party to this appeal. At the time of the original detention in 2006, LaR.S. was 13 years old; LaD.S. was 16.

medicated, which then impacted his behavior at school. Because of this incident, B.T. was found to be an inappropriate placement.

After completing her case plan, and because of the significant bond between the minor, mother, and his sisters, the minor and his sisters were returned to mother's care in July 2007 with continued family maintenance services. Upon the initial placement, the minor experienced increased difficulties in school. The school believed this was caused by his not taking his medication. Eventually mother provided the school with an extra supply of medication.

As time went on, mother continued to have difficulty complying with court orders. She regularly failed to drug test, tested positive for marijuana, struggled with psychotropic medication compliance and, in September 2007, she allowed a homeless man who called himself "H.D." (an acronym for "Handsome Devil") to move into the home. The sisters contacted the Department about this because they did not feel safe with H.D. Initially, mother refused to provide any background information on H.D., insisting he was staying in the home and the Department could do whatever they wanted with the children, as they did not run her life. Mother eventually provided the information for a background clearance. The background clearance showed a dismissed domestic violence charge. In addition, the social worker received numerous contacts from the children reporting family discord and that the situation was escalating. Mother had also discontinued use of her psychotropic medications. The minor reported mother had a party where she was smoking marijuana and drinking.

The minor's behavior continued to improve. His school attendance was fair. He had made tremendous progress in his counseling. He and sister were very supportive of each other and got along well. By May 2008, mother was compliant with her psychotropic medications and was presenting as stable. She had completed individual and family counseling and parenting classes, and was participating in programs with the minor to learn to manage his behaviors. Accordingly, the social worker "guardedly" recommended termination of dependency.

On May 19, 2008, mother was arrested for domestic violence against H.D.[3] H.D. alleged mother also physically abused the minor, threatened to slit the minor's throat, did not take her medications and instead sold the medication. Mother denied these claims. However, she acknowledged she had been arrested and that there had been a domestic violence incident

---

[3] The ex-boyfriend is referred to in the March 2008 amended report as "Howard N."; however, as he is identified by the minor as H.D., we will assume the two are one and the same and continue to refer to the boyfriend/ex-boyfriend as H.D.

between her and H.D. She also denied using corporal punishment on the minor, and stated if the minor had made that claim, he was lying and "he will lie about everything." She also attempted to intimidate the minor as he was being interviewed by the social worker.

The minor reported H.D. had lived in the home, but had moved out the day before. The minor reported mother hit him with a belt on his butt when he was bad. He denied mother had threatened to slit his throat and denied he was afraid of mother. Mother again attempted to intimidate the minor during the social worker's interview. Based on this recent turn of events, the social worker changed her recommendation to continuing dependency. On July 1, 2008, the court followed that recommendation and continued sister and the minor as dependents of the court.

When the social worker interviewed the minor in July 2008, he was anxious, refused to make eye contact, was fidgety and making loud random noises. The minor had been sent to school in his pajamas. Other times mother did not know where the minor was or whether he was in school. On various occasions, mother presented as confused and unaware of the minor's location. She also sounded inebriated at times. The minor continued to present challenging behaviors in the home. Mother repeatedly resisted visits from the social worker and avoided contact. When the social worker did make contact, mother was "hostile, erratic, and disorganized in her thought content with slurred speech." Mother also failed to drug test as required. From August 2008 to December 2008, mother was appropriate in her interactions with the social worker, and presented as lucid. However, mother continued to test positive for low levels of marijuana and Vicodin.

Mother continued in her relationship with H.D. She admitted H.D. was a likely drug user and presented as unstable. H.D. refused to drug test and refused to participate in the process to have him approved as a resident in mother's home.

On February 25, 2009, a subsequent petition under section 342 was filed. The petition alleged sister and the minor were at risk due to mother's alcohol abuse and physical altercations with them.[4] The petition was based on a claim by sister that mother had physically assaulted her. The minor also reported mother had physically abused him. He told the social worker he wanted to go back to the group home as he did not feel safe. Sister also reported that H.D. stayed overnight in the home on numerous occasions. The children were ordered detained.

---

[4] Sister LaD.S. was over 18 years old by this time and so was not included in the subsequent petition.

The minor's behavior in school improved when he was removed from mother's care. When he was with mother, he had more difficulty remaining "on task" and had difficulty controlling his frustration.

In June 2009, mother and H.D. had an altercation which resulted in each of them filing for restraining orders against the other. On June 22, 2009, mother's application for a restraining order against H.D. was granted.

Ultimately, both children recanted their claims of abuse. On June 25, 2009, the children were placed back with mother. The court noted, however, that it believed mother had been drinking and that there had been a physical altercation between mother and sister. The juvenile court also issued a no-contact order between the children and H.D. on June 25, 2009.

Mother and H.D. were both arrested and detained on July 4, 2009. Mother had gone to H.D.'s residence and had engaged in a dispute with H.D. in front of sister. Sister and the minor were returned to protective custody.

On July 9, 2009, a supplemental petition was filed alleging that (1) mother had a history of psychiatric and emotional problems which impaired her judgment and ability to provide adequate care and supervision to the children; (2) mother had been noncompliant with her psychotropic medication and that noncompliance put her children at risk; and (3) mother had failed to make substantive progress in or benefit from reunification services, as demonstrated by her continuing to engage in domestic violence with H.D. The children were ordered detained on July 15, 2009, and placed separately.

Mother had been terminated from her counseling sessions in July 2009 due to excessive absences. She was also too "emotionally explosive" to participate in group counseling. Mother was discharged from the WEAVE (Women Escaping a Violent Environment) program for performing unsatisfactorily.

In July 2009, the minor was interviewed and reported he wanted to live with his older brother, Christopher. He denied ever saying he was hungry, ever being hit by mother or ever witnessing mother or her friends do drugs. Later, the minor reported he wanted to return home. He was acting out in the foster home and "messing" with the other children. He was eating and sleeping normally.

An amended section 387 petition was filed on September 4, 2009, adding the allegation that mother had a substance abuse problem from which she had failed to rehabilitate. It was noted she had tested positive for marijuana in February and August 2009, and positive for both marijuana and Vicodin in April and May 2009. In addition, mother had not drug tested twice a month as directed.

Following a contested jurisdictional/dispositional hearing, the court found the allegations in the petition true, and declared the children dependents. Reunification services were terminated as to the minor and the matter was set for a permanency hearing.

Mother and the minor had weekly supervised visits. Sister also participated in these visits. The minor was generally happy going to and returning from visits and was negatively affected when mother missed a visit. Visits with sister were also positive.

The minor was physically healthy. He was still easily distracted, and had occasional "behavioral eruptions" at school, but both these issues were steadily improving. He was interacting well with staff and peers. He interacted and engaged positively with his foster parents.

B.T. was once again assessed for potential placement. She and her husband were still willing to adopt the minor. The evaluation included obtaining criminal background/child abuse clearances and an assessment of her ability to provide basic care and supervision. There were no concerns relative to her marital status, employment and income, mental and physical health, alcohol or drug involvement, domestic violence, childcare arrangements or disciplinary techniques. B.T. had known the minor since birth and had had regular contact with him. She had placement of him for some time in 2007. B.T. was aware of the minor's behaviors and willing to maintain needed services. The minor was excited at the prospect of living with B.T. and said he wanted to be adopted by B.T. and live with her for many years. The minor was placed in B.T.'s home on February 8, 2010.

Sister filed a section 388, subdivision (b) petition, seeking standing at the permanency hearing to present evidence on the sibling relationship between herself and the minor and to assert the sibling bond exception to adoption. The juvenile court granted this motion.

Mother's visitation schedule was reduced because of the deterioration in the minor's behavior after visits. His negative behaviors, both at home and school, increased tremendously and it took days for him to stabilize. The minor's behavior at school had improved since his placement with B.T.

The minor had adjusted well to his placement with B.T. and was happy in the home. He was excited to show off his room and talk about living with her. He stated he wanted to continue living with her until adulthood. He also stated sister and mother were important to him and asked if he would continue to visit with them if he were adopted. Although visits between sister and the minor were scheduled to take place on a biweekly basis, sister missed

three scheduled visits. The minor was angry after the first missed visit, but expressed no disappointment after the next two missed visits.

B.T. was open to continued supervised visits with mother and sister. However, she expressed concerns for her safety and the minor's, based on mother's behavioral history and violent tendencies. She also believed there had been a threat to abscond with the minor. Nonetheless, she was willing to continue visits and sustain an ongoing relationship as long as it was adequately supervised and contact remained in the minor's best interest.

Neither mother nor sister appeared at the permanency hearing. Sister did not present evidence at the hearing. The juvenile court found the minor was specifically adoptable. There was a specific family member (B.T.) committed to adopting him and there was no legal impediment to her adopting him. The court also noted there was clear and convincing evidence of B.T.'s commitment to the minor as well as her exceptional care of him.

The court further found mother had not met her burden of establishing the parental bond exception to adoption. The court acknowledged the first prong had been met, in that visitation had been regular and consistent. However, there had been "no showing whatsoever by the mother to establish that the strength and quality of her relationship with this child overcomes the benefit that he would get through adoption with his current caregivers."

As to the sibling bond exception, the court noted it was mother's and sister's burden to establish the exception. The court acknowledged the existence of the close sibling bond between the minor and sisters based on their lives together and shared common experiences. Nonetheless, the court found there was not a sufficiently significant relationship between them such that termination of parental rights would cause detriment to the minor. The court found the evidence established that the minor wanted to stay in B.T.'s home and be raised by B.T. and her husband. The juvenile court terminated parental rights.

At the same hearing, dependency for sister was terminated and she was emancipated.

## DISCUSSION

### I

*Standing*

### A. *Legally Cognizable Interest*

■ Standing to appeal extends only to a "party aggrieved" by the order appealed from. (Code Civ. Proc., § 902; see Welf. & Inst. Code, § 395; *In re Aaron R.* (2005) 130 Cal.App.4th 697, 703 [29 Cal.Rptr.3d 921]; *In re Crystal J.* (2001) 92 Cal.App.4th 186, 190–191 [111 Cal.Rptr.2d 646].) "To be aggrieved, a party must have a legally cognizable immediate and substantial interest which is injuriously affected by the court's decision. A nominal interest or remote consequence of the ruling does not satisfy this requirement." (*In re Carissa G.* (1999) 76 Cal.App.4th 731, 734 [90 Cal.Rptr.2d 561] (*Carissa G.*).) The ability to appeal does not confer standing on parties not aggrieved by the order from which the appeal is taken. (*In re Joseph G.* (2000) 83 Cal.App.4th 712, 715 [99 Cal.Rptr.2d 915]; *In re Frank L.* (2000) 81 Cal.App.4th 700, 703–704 [97 Cal.Rptr.2d 88] (*Frank L.*); *Carissa G., supra,* 76 Cal.App.4th at p. 734; *In re Gary P.* (1995) 40 Cal.App.4th 875, 877 [46 Cal.Rptr.2d 929].)

■ Standing to challenge an adverse ruling is not established merely because a party takes a position on an issue that affects the minor. (*Frank L., supra,* 81 Cal.App.4th at p. 703.) Without a showing that the party's personal rights are affected by a ruling, the party does not establish standing. (*Ibid.*) "The interest of siblings or other relatives in their relationship with the minor is separate from that of the parent." (*Ibid.*) In sum, a would-be appellant "lacks standing to raise issues affecting another person's interests." (*In re Gary P., supra,* 40 Cal.App.4th at p. 876.)

■ Neither mother nor sister has put forward a legally cognizable interest that would allow sister to challenge the termination of parental rights. Rather, they both argue that sister has a legally cognizable interest in maintaining a sibling relationship and visitation with the minor. "At stake in a dependency proceeding is both the [dependent] child's welfare and the parent-child relationship." (*In re Patricia E.* (1985) 174 Cal.App.3d 1, 6 [219 Cal.Rptr. 783].) The legally cognizable interest in the maintenance of the sibling relationship relates to the *minor's* welfare and the relationship between him and mother. It is *the minor's* interest, not his sister's interest, that is at issue. (*In re Celine R.* (2003) 31 Cal.4th 45, 55 [1 Cal.Rptr.3d 432, 71 P.3d 787] (*Celine R.*).)

In arguing that sister, an adult sibling, has standing to appeal the termination of mother's parental rights, both mother and sister focus on the fact that section 388, subdivision (b) does not preclude adult siblings from petitioning to participate in the permanency planning hearing. We agree the statute permitted sister to petition to participate in the permanency planning hearing. Had the court denied her section 388 petition, she would have had standing to appeal that denial. (*In re Hector A.* (2005) 125 Cal.App.4th 783, 793 [23 Cal.Rptr.3d 104].)

■ We understand that "[t]he [nonadoptive] sibling's relationship with the child is not irrelevant." (*Celine R., supra*, 31 Cal.4th at p. 55.) Evidence of the sibling relationship and the nonadoptive sibling's view of the relationship and "emotional resistance towards the proposed adoption may also implicate the interests of the adoptive child." (*Ibid.*) The juvenile court gave sister the opportunity to participate in the permanency planning hearing and present evidence on the sibling relationship exception[5] in acknowledgment of the relevance of sister's contribution toward understanding the sibling relationship. "But the ultimate question is whether adoption would be detrimental to the adoptive child, not someone else." (*Ibid.*) "[T]he court may reject adoption under this sibling relationship provision only if it finds adoption would be detrimental to the child whose welfare is being considered. It may not prevent a child from being adopted solely because of the effect the adoption may have on a sibling." (*Celine R., supra*, 31 Cal.4th at pp. 49–50.)

■ In raising the sibling relationship exception before the juvenile court, sister was not asserting her own interest or right. Rather, she was asserting the minor's interest on his behalf. In this way, conferring the ability to participate in the permanency planning hearing on sister is similar to conferring de facto parent status on a caregiver. The acquisition of de facto parent status does not confer standing to appeal from *any* juvenile court order; rather, it confers standing to challenge only orders pertaining to those things to which the de facto parent is entitled. (*Clifford S. v. Superior Court* (1995) 38 Cal.App.4th 747, 752 [45 Cal.Rptr.2d 333].) Sister is not entitled to challenge the termination of parental rights nor does she have a right to block the minor's adoption. Thus, although sister was permitted to assert the sibling relationship exception to adoption and present evidence on the issue, she has no standing to challenge the termination order because *her* legal rights are not impacted by that order. (*Frank L., supra*, 81 Cal.App.4th at p. 703.)

---

[5] We note that although this opportunity was provided by the juvenile court, sister failed to attend court at the date and time previously set for the contested hearing, thus failing to take advantage of this opportunity.

### B. *Impact of Sibling Relationship*

■ Mother and sister also argue that sister has a substantial interest which was injuriously affected by the court's decision "because it directly impacts the sibling relationship [she] shared with her brother." We disagree. We understand that if terminating parental rights will substantially interfere with the sibling relationship, *and the detriment of that interference outweighs the benefit of permanence for the child*, terminating parental rights may not be appropriate. (See *Celine R., supra*, 31 Cal.4th at pp. 49–50.)

Here, however, sister was an adult sibling no longer bound by her relationship with mother. She was fully capable of having a relationship with her brother regardless of whether mother's parental rights remained intact. "[T]erminating parental rights, here, can in no way interfere with the sibling relationship; just as retaining parental rights would in no way preserve the sibling bond. . . . Where the parents' continuing relationship with the dependent child, or absence thereof, can in no way affect the nature of the sibling relationship because the parent no longer has a relationship with the sibling, the exception does not apply." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 403 [127 Cal.Rptr.2d 922].) Here, although sister and mother may well have continued their relationship, they had graduated to an adult relationship, where sister was no longer in a position to be automatically affected by mother's lack of legal status as parent of both sister and the minor.

■ Mother argues that sister's standing to appeal termination of parental rights is analogous to a parent's standing to raise the sibling exception to adoption. We disagree. A parent has standing to raise the sibling exception to adoption because successful application of the exception *would preclude parental rights from being terminated*. Termination of parental rights clearly impacts the parent-child relationship and presents a situation in which the parent has a legally cognizable interest that is injuriously affected by the order. (*In re Patricia E., supra*, 174 Cal.App.3d at p. 6.)

Sister's position, however, is analogous to the myriad of situations where courts have held a parent lacks standing to raise an issue because the parent's personal interests were not affected. (See, inter alia, *In re Nachelle S.* (1996) 41 Cal.App.4th 1557, 1561–1562 [49 Cal.Rptr.2d 200] [parent does not have standing to raise the child's right to visit her adult siblings after parental rights were terminated]; *In re Gary P., supra*, 40 Cal.App.4th at p. 877 [mother did not have standing to assert terminating her parental rights interfered with her child's relationship with his grandmother]; *In re Daniel D.* (1994) 24 Cal.App.4th 1823, 1835 [30 Cal.Rptr.2d 245] [parent did not have standing to challenge the court's denial of de facto parent status to child's grandmother]; *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023,

1026–1028 [111 Cal.Rptr.2d 243] [presumed father of two minor children lacks standing to appeal refusal to place children with grandmother]; *In re Crystal J., supra*, 92 Cal.App.4th at pp. 189–190 [anyone other than de facto parent, including minor child, does not have standing to appeal denial of a de facto parent motion].)

■ Sister lacks standing to appeal the termination of parental rights. Accordingly, her appeal is dismissed.[6]

II–V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

Sister's appeal is dismissed. The orders of the juvenile court are affirmed.

Robie, Acting P. J., and Butz, J., concurred.

A petition for a rehearing was denied June 8, 2011, and the petition of appellant J.B. for review by the Supreme Court was denied August 17, 2011, S194141.

---

[6] Ordinarily, the dismissal of sister's appeal would obviate the need for us to address the issues raised in her briefing. Mother adopted these arguments, however, in her reply brief. Accordingly, we will address them *post*.

*See footnote, *ante*, page 707.