Filed 6/30/15  In re J.C. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.C. et al., Persons Coming Under the Juvenile Court Law. | B258869 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>PATRICIA C. et al.,<br><br>        Defendants and Appellants. | (Los Angeles County Super. Ct. No. CK34933) |

        APPEAL from orders of the Superior Court of Los Angeles County.  Tony L. Richardson, Judge.  Dismissed in part, affirmed in part and reversed in part.

        Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant Patricia C.

        Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant Rene P.

        Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

_____

The juvenile court found Patricia C. (mother), neglected J.C., her 14-year-old daughter, by failing for two months to take advantage of mental health services J.C. desperately needed. The court found this neglect endangered J.C. and her two sisters, declared the children dependants, and ordered that they remain placed in the home of mother and her husband, Rene P., and avail themselves of offered services. The court also found that J.C.'s biological father was a presumed parent and ordered that he be granted visitation three hours per week. Six months later, the court terminated jurisdiction.

On appeal, mother and Rene P. contend the findings and orders were unsupported by substantial evidence. We conclude Rene P. has no standing to appeal, and part of mother's appeal is moot. On the merits, we conclude the jurisdictional finding as to J.C. was supported by substantial evidence but the finding as to her sisters was not. Accordingly, we dismiss Rene P.'s appeal and otherwise affirm in part and reverse in part.

**BACKGROUND**

On May 15, 2014, J.C. arrived at school with approximately a dozen self-inflicted lacerations on her right arm from wrist to shoulder, several of which were nonsuperficial. She told her counselor she felt nobody cared about her, and she had written on her notebook, "I'm not afraid to die," "no one cares about me," and "life sucks." She had also written a poem in which she stated she wanted to be "like the waves and the sky," and reported she felt this way because of a lack of a relationship with Pierre B., her biological father. A social worker from the Department of Children and Family Services (DCFS or the department) arrived at the school within the hour, with a Psychiatric Mobile Response Team (PMRT) arriving shortly thereafter.

When mother arrived at the school, she berated J.C. for embarrassing her and said she had no reason to feel the way she did because she had everything—shoes, clothes and hair styling—and it was not her fault that Pierre B. wanted nothing to do with her. The social worker and PMRT attempted to redirect mother and explain that her comments were unhelpful, but she "continued as if she was unable to help herself," telling J.C. that

2

she should appreciate all she has. The psychiatric team ultimately separated mother from J.C.

J.C. then told PMRT members she felt like the black sheep of the family, she could not talk to mother about the way she felt, and was fearful about what would happen when she found out. Her affect was "suppressed and flat," and she presented as suffering from "low self-esteem and hopelessness." The psychologists assessed J.C. as exhibiting signs of depression, and it was thought that her self-inflicted wounds were posturing for suicide and had become progressively worse over the recent months and would continue to do so, becoming life threatening. Because it was predicted she would receive no support at home, J.C. was detained on an involuntary psychiatric hold at Charter Oak Hospital, a mental health care facility in Covina. (Welf. & Inst. Code, § 5050.)[1]

On May 19, 2014, J.C. was released from Charter Oak, but the hospital reported mother was not returning telephone calls.

On May 28, 2014, mother denied J.C. had any issue that needed to be addressed in therapy, telling the social worker her daughter was "fine." DCFS nevertheless insisted that mother make an appointment for J.C. with the Harbor UCLA Child and Adolescent Clinic. Mother did so, but during the prescreening telephone call denied that J.C. needed services.

On June 13, 2014, mother stated she felt DCFS was harassing her, J.C. needed no services, and she did not want DCFS to return to her home.

On June 17, mother and J.C. appeared at Harbor UCLA for J.C.'s appointment, but left before being seen, mother stating she did not feel well. When J.C.'s assigned evaluator followed them to the parking lot to try to persuade them to return, mother felt she was being harassed, and the next day told Harbor UCLA she was going to file a complaint. Mother thereafter failed to answer her home telephone (with no option to leave a message), and calls to her cell phone resulted in an automated message indicating

---

[1] All statutory references will be to the Welfare and Institutions Code.

3

the phone was not accepting calls. Neither DCFS nor Harbor UCLA was able to reach mother by telephone.

On July 3, 2014, mother reported she had made no attempt to obtain services for J.C., again claiming the child was "fine."

On July 15, 2014, mother took J.C. back to Harbor UCLA, but would not allow J.C. to answer questions or be interviewed separately, but instead informed the therapist that J.C. was not sad and was doing fine.

On July 16, 2014, mother refused services that had been offered to J.C., said she would be retaining an attorney instead, and made a call to Harbor UCLA to complain about the conduct of J.C.'s appointed therapist.

On July 24, 2014, DCFS filed a non-detained petition in the Los Angeles County Superior Court alleging mother neglected J.C.'s mental and emotional problems, which endangered the child's physical health and safety as well as the health and safety of two of her sisters, Vivian P. and M.P. There has never been an allegation that any of the children were abused or physically neglected or that their living arrangements were substandard. On the contrary, the home situation was deemed appropriate and the children were observed to be well cared for, except for mother's refusal to accept voluntary mental health services for J.C.

The next day, on July 25, 2014, mother took J.C. to the first of what was to become weekly therapy sessions at Harbor UCLA.

On August 5, 2014, mother told a dependency investigator she too had been having thoughts about killing herself. Yet she reported the family was happy, healthy, busy, and very close, and that because her husband made a lot of money, they were "always spending" and were able to "go out to eat as [they] please." She reported she often spent $500 or $800 while out shopping, and her daughters got "whatever they want." Mother also reported she walked out on J.C.'s first appointment at Harbor UCLA because she did not feel well, and missed a second appointment because an older daughter was in the process of graduating from high school, and she said her cell phone had been disconnected because, in the words of the investigator, "she had to buy [the

4

older daughter] supplies for college instead." She denied being unwilling to accept services for J.C., but the Harbor UCLA staff mistreated her and the DCFS social worker was rude.

Mother's husband, Rene P., who is the biological father of Vivian P. and M.P. but not J.C., reported that mother complied with everything that was asked of her and offered his opinion that DCFS should be investigating the school, not the family.

At the jurisdiction hearing on August 22, 2014, the juvenile court found J.C., Vivian P. and M.P. were described by section 300, stating it found mother's recent cooperation with DCFS and Harbor UCLA would not likely continue unless the court "has eyes on this family." Although mother and Rene P. requested informal services pursuant to section 360,[2] at the disposition hearing on September 8 the court denied the request, declared the children dependents of the court, and ordered that they be placed with mother and Rene P. and participate in family preservation services, individual counseling, and conjoint counseling when appropriate.

The court also found that both Rene P. and Pierre B. were J.C.'s presumed fathers and ordered that Pierre be granted unmonitored visitation with J.C. three hours per week.[3]

Mother and Rene P. timely appealed.

On March 13, 2015, the juvenile court terminated jurisdiction.

## DISCUSSION

Mother and Rene P. contend the findings that mother failed to protect J.C. and that the failure endangered Vivian P. and M.P. were unsupported by substantial evidence. They also contend the finding that Pierre B. was a presumed father was unsupported by substantial evidence.

___

[2] Section 360, subdivision (b) provides: "If the court finds that the child is a person described by Section 300, it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker for a time period consistent with Section 301."

[3] Pierre B. does not appeal.

**A.      Standing**

Rene P. offers no explanation how he was aggrieved by the orders from which his appeal is taken.  "Not every party has standing to appeal every appealable order.  Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal.  [Citations.]  An aggrieved person, for this purpose, is one whose rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision.  [Citations.]  These rules apply with full force to appeals from dependency proceedings." (*In re K.C.* (2011) 52 Cal.4th 231, 236.)  A parent "may contest only such orders which injuriously affect him or her.  The appellant cannot urge errors which affect only another party who does not appeal." (*In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1503-1504 [order compelling father to pursue psychological counseling could not injure mother; therefore mother had no standing to appeal].)

According to the September 8, 2014 minute order, the juvenile court sustained a petition against mother only, declared the children dependents, placed them with mother and Rene P., and ordered that J.C.'s biological father be permitted to visit her three hours per week.  Rene P. fails to explain how this arrangement adversely affected him, especially now that jurisdiction has been terminated.  He claims the sustained allegation has a "current impact on [his] family" but does not identify what that impact is.  On the contrary, he argues only that the jurisdictional finding "will be used against the family if there is a future referral," meaning any impact is at best conditional and speculative.  Rene P. complains the juvenile court "labeled his wife as a child abuser and his children as victims of child abuse," which affects him because he lives with them, but this is not a legally cognizable interest.  (See *In re J.T.* (2011) 195 Cal.App.4th 707, 717 [to establish standing, an appellant must show his or her own personal rights were affected].)

Rene P.'s appeal is therefore dismissed.  Mother likewise lacks standing to challenge the juvenile court's finding that Pierre B. is one of J.C.'s presumed parents, as she offers no explanation how that finding implicated her personal rights.  Her appeal of the finding is therefore also dismissed.

6

**B.      Mootness**

The department argues we need not entertain mother's appeal because the juvenile court has terminated jurisdiction, which renders it impossible for us to issue any practical relief.  Mother argues we should address the jurisdictional findings because they might have some consequence in a future dependency proceeding.

"The question of mootness must be decided on a case-by-case basis.  [Citation.] An issue is not moot if the purported error infects the outcome of subsequent proceedings." (*In re Dylan T*. (1998) 65 Cal.App.4th 765, 769.)  Mother's claim of a future impact is indeed speculative, as a finding of jurisdiction in any dependency proceeding must be based on current conditions.  But DCFS routinely cites prior dependency proceedings in current reports (and did so in this case), giving some weight to mother's claim that the current proceedings could have a future impact.  We will therefore evaluate her claims regarding whether substantial evidence supported the juvenile court's findings.  (*In re D.P*. (2014) 225 Cal.App.4th 898, 902; *In re Drake M*. (2012) 211 Cal.App.4th 754, 762-763.)

**C.      Standard of Review**

At a jurisdictional hearing, a juvenile court must base its findings on a preponderance of evidence.  (*In re J.K*. (2009) 174 Cal.App.4th 1426, 1432.)  "On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings.  [Citation.]  The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value." (*Id.* at p. 1433.)  "In making this determination, all conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]  In dependency proceedings, a trial court's determination will not be disturbed unless it exceeds the bounds of reason." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)  In other words, "[i]t is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence.  We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the

7

credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citations.] Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Casey D*. (1999) 70 Cal.App.4th 38, 52-53.) "In dependency proceedings, a trial court's determination will not be disturbed unless it exceeds the bounds of reason." (*In re Ricardo L.*, *supra*, at p. 564.)

## D.    Subdivision (b)

Mother contends insufficient evidence supports the finding that she failed to protect J.C. because it is undisputed that J.C. was receiving mental health services by the time of the jurisdiction hearing. Therefore, mother argues, no circumstances existing *at the time of the hearing* indicated J.C. had suffered or likely would suffer serious physical harm or illness. We disagree.

A child comes within the jurisdiction of the juvenile court under subdivision (b) of section 300 if he or she "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." (§ 300, subd. (b)(1).) "[A] court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm." (§ 300, subd. (a).) "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm." (*In re Rocco M*. (1991) 1 Cal.App.4th 814, 824.) Thus past physical harm, "standing alone, does not establish a substantial risk of physical harm; '[t]here must be some reason to believe the acts may continue in the future.'" (*Ibid*.)

In May 2014, J.C. appeared at school with several nonsuperficial, self-inflicted lacerations. Her affect was suppressed and flat, she suffered low self-esteem and

8

hopelessness, she felt nobody cared about her, and she had written she was not afraid to die, life "sucked," and she wanted to be like the sky. These danger signals rightly alarmed almost everyone. The school called a PMRT, which called DCFS. A DCFS social worker arrived at the school within the hour, with the PMRT arriving shortly thereafter. The PMRT concluded J.C. was posturing for suicide and her self-destructive behavior could escalate and become life threatening, and therefore placed her in protective custody at a mental health facility. Thereafter, the social worker and several mental health professionals labored for two months to obtain mental health services for J.C.

Mother was less concerned. She felt embarrassed, thought J.C. ungrateful, and failed to answer phone calls, return messages, or keep mental health appointments. From May to July 2014, mother consistently denied J.C. needed help, interfered with attempts to provide such help, complained about how she herself was being treated, and attempted to bar DCFS from her home, repeatedly saying J.C. was fine. Mother continued to refuse voluntary mental health services for J.C. until DCFS filed the instant petition. These circumstances provide ample evidence to conclude that mother refused to address J.C.'s serious mental health needs until forced to do so, and that those needs and mother's unmindfulness constituted a substantial risk that the child would suffer serious physical harm as a result of mother's failure to protect her.[4]

## E. Subdivision (j)

Mother contends no evidence supported the juvenile court's exercise of jurisdiction over Vivian P. or M.P. We agree.

Jurisdiction under subdivision (j) of section 300 may be exercised where a "child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those

---

[4] Mother's appointed counsel states in her opening brief that "Although J.C. had cut herself, there was no evidence that she had been seriously physically harmed." The lack of appreciation that a teenager cutting herself reflects serious physical harm underscores the need for juvenile court oversight.

9

subdivisions." (§ 300, subd. (j).) Subdivisions (a), (b), (d), (e), and (i) define abuse or neglect as physical harm or illness, physical or sexual abuse, or acts of cruelty.

No evidence of any such abuse or neglect appears in the record as to Vivian or M.P., and DCFS adduces none. On the contrary, DCFS declined to make any allegation in the petition regarding mother's conduct as it related to Vivian,[5] and admits on appeal that M.P. had no complaints or issues to address. The department argues merely that mother's "clouded" judgment when it came to seeking mental health services for J.C. is "relevant to whether J.C.'s siblings were at risk." The argument is without merit because subdivision (j) of section 300 does not include clouded judgment as a basis for exercising jurisdiction over a dependent minor's siblings.

## DISPOSITION

Rene P.'s appeal is dismissed. The juvenile court's orders are affirmed as to J.C. and reversed as to Vivian P. and M.P.

NOT TO BE PUBLISHED.


CHANEY, Acting P. J.

We concur:


JOHNSON, J.                              BENDIX, J.[*]

---

[5] Vivian P., age 11, suffers from Tourette's Syndrome, manifested by certain verbal and motor tics. Although her school had an Individualized Education Program to address her issues, she attended school only one day in August and September 2013 and no days from October 15, 2013 to May 15, 2014, missing a total of all but 14 days. The assistant principal went to her house and, receiving no answer to his knock, taped his business card to her front door. When mother called the school, she was "erratic, bizarre, and irrational," would not allow the assistant principal to speak, and said she would do anything to keep Vivian out of school because her teachers were not helping her and she was being bullied. The school psychologist, reported Vivian was not being bullied. On May 16, 2014, Vivian began home schooling. At all times, mother denied Vivian needed any services to help her learn to manage her Tourette's Syndrome, stating she was "fine."

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

10