Filed 11/24/15  In re G.H. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re G.H., et al., Persons Coming Under the Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>JOSE H.,<br><br>        Defendant and Appellant. | B263115<br><br>(Los Angeles County Super. Ct. No. CK96869) |

APPEAL from an order of the Superior Court of Los Angeles County, Anthony Trendacosta, Judge.  Affirmed.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

Appellant Jose H. (Father) appeals the February 2, 2015 order terminating his parental rights over two of his three children, five-year old Santino and three-year old Molly, under Welfare and Institutions Code section 366.26.[1]  Father contends the section 366.26 hearing should have been continued to permit the court to consider termination of parental rights over Santino and Molly at the same time as the permanent plan for an older sibling, 13-year old G.H., and to permit the completion of a home study for the paternal relatives hoping to adopt the younger children.  He contends that by terminating parental rights over the younger children prior to determining the final placement of any of the children, the court risked severing a significant sibling relationship.  We conclude substantial evidence supported the court's implicit finding that any benefits of a sibling relationship to the younger children did not outweigh the benefits of an adoptive home, and that the court did not err in refusing to continue the hearing.  Accordingly, we affirm the order terminating parental rights.

**FACTUAL AND PROCEDURAL BACKGROUND**

The family came to the attention of the Department of Children and Family Services (DCFS) on November 28, 2012, when it received reports that the parents used drugs and often left the children in the care of the paternal grandfather, who was unwell.  At the time, the couple had been separated for a few months.  G.H., then 10 years old, had been living with Father and the paternal grandfather since the separation.  The two younger children, Santino (then 3) and Molly (then 21 months), had lived with Mother after the separation, but had recently been left with Father and the paternal grandfather.  Father admitted methamphetamine use and a recent arrest for drug possession, which led to his enrollment in an outpatient drug

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

program in early November.[2] He also admitted past depression and suicide threats. Mother admitted a five-year history of methamphetamine use. G.H., who often had to take care of her younger siblings, said she felt responsible for the family's problems, and that she had attempted suicide when she was younger.

Father and Mother waived their right to contest jurisdiction, and in February 2013, the court found true that they had a history of substance abuse, rendering them incapable of providing regular care of the children, and that Mother inappropriately disciplined G.H. on one occasion. Father and Mother were ordered to participate in a drug treatment program, weekly drug testing, a parenting class and individual counseling to address case issues.

Due to his drug-related arrest, Father had been enrolled in a substance abuse treatment program prior to DCFS's involvement, but did not attend or test regularly.[3] He entered a new 90-day treatment program in October 2013, but admitted using methamphetamine after completing the program. Father entered another treatment program in April 2014, and tested positive for methamphetamine and PCP in May 2014. He visited the children only occasionally during the year-long reunification period. At the 12-month review hearing in June 2014, the court terminated reunification services for both parents and set an October 7, 2014 section 366.26 hearing to consider the permanent plan for all three children.

The children were initially placed together in a foster home. In February 2013, all three children were placed with paternal cousins, the A.'s, who were licensed foster parents. Santino and Molly did well in the placement and bonded

---

[2]    Although Father and Mother claimed to have stopped using drugs, their on-demand drug tests for DCFS were positive for methamphetamine.

[3]    Mother made some initial progress, but soon dropped out of her programs, stopped contacting the caseworker and ceased nearly all visitation with the children. She is not a party to this appeal.

with the A.'s immediately. G.H. experienced mood swings and behaved badly. She was physically aggressive with her younger siblings, and destroyed property. She repeatedly expressed her desire to return to her parents' care. DCFS provided wraparound services and therapy for the girl. Nonetheless, in January 2014, the A.'s reported that G.H. was lying, being disrespectful and hitting her siblings. In April 2014, the A.'s asked that G.H. be removed from their home. G.H. was moved into a group home and considered for placement with foster parents able to deal with a troubled child.

Shortly after G.H. was removed from the A.'s home, her counsel requested appointment of a CASA (Court Appointed Special Advocate) for the girl because she was "separated from her siblings" and needed "a supportive person to assist in this transition and the likelihood that her siblings will be in adoptive planning."[4] In September 2014, the court appointed a CASA. In October 2014, just prior to the date of the original section 366.26 hearing, G.H. was placed with a paternal aunt, in the hope that the aunt would eventually agree to become the girl's legal guardian. That same month, the A.'s expressed a desire to adopt the younger siblings. However, the paternal aunt, having just accepted G.H. into her home, was not ready to proceed with the permanent plan of legal guardianship, and asked for six months to consider. On October 7, 2014, the court continued the section 366.26 hearing to December 9, 2014 for the younger children and April 7, 2015 for G.H.

---

[4] In June 2014, when the court terminated the parents' reunification services, it set a prospective permanent plan of placement in a group home for G.H. and a prospective permanent plan of adoption by the A.'s for the younger siblings.

On December 5, 2014, Father submitted a petition for modification of court orders under section 388.[5] He presented evidence he had been successfully participating in the latest treatment program and that he was "clean and sober." The program reported Father had submitted to 21 tests since May 2014, and that the tests had been negative for all substances.[6] Father's counselor reported he was ready to be discharged and begin aftercare. The paternal aunt reported that Father had been visiting G.H. regularly. However, he was not regularly visiting the younger children, having seen them only four times in the previous six months.

Just prior to the December 9, 2014 hearing scheduled to determine the permanent plan for the younger children, the paternal aunt reported that she had considered having G.H. removed because the girl had become aggressive toward the aunt's young children, and was lying, stealing and being disrespectful. The CASA reported that G.H. was happy living with her aunt, but concerned about losing contact with her siblings if they were adopted and wanted to maintain contact with Father. The CASA recommended that the court facilitate sibling visitation, as it had been difficult for the families to arrange visitation on their own. At the December 9 hearing, the court ordered DCFS to set up a twice monthly sibling visitation schedule and continued a final decision on the permanent plan for the younger children to February 4, 2015, the same day as the hearing on Father's section 388 petition.

Prior to February 4, DCFS reported that the A.'s home study had not been completed. At the hearing, addressing Father's section 388 petition, the children's

---

[5] The court set a hearing on Father's section 388 petition for February 4, 2015, at which time it was denied with respect to the younger children and continued for further consideration with respect to G.H. Father does not appeal that denial. However, the petition had some bearing on the court's later actions, so we briefly summarize it.

[6] There were two no-shows in October 2014 and Father did not comply in January 2015, when DCFS requested an on-demand test.

counsel argued that it would not be in the younger siblings' best interest to be returned to Father, as they had been out of his custody for two years and had no real bond. She acknowledged that G.H. was in a different position, and recommended that the court approve unmonitored visitation with her once Father established he was participating in aftercare and continuing to test clean. DCFS's counsel also opposed Father's section 388 petition while acknowledging that G.H. was in a different position from the younger siblings, as she had no prospective adoptive home. The court agreed, and "trail[ed]" or continued the section 388 petition with respect to G.H. for further consideration. With respect to the younger siblings, the court found it would not be in their best interest to return them to Father, and denied the petition as it related to them.

With respect to the section 366.26 issues, the children's counsel asked the court to terminate parental rights over Santino and Molly to clear the way for their adoption by the A.'s, representing that all the paperwork had been completed for the home study and that it was close to final approval. Father's counsel asked the court to continue the matter to April 2015, the date for the hearing on the permanent plan for G.H., contending it was better to wait until the home study was completed. The court stated that the law was clear: once it found the children adoptable, as Santino and Molly clearly were, it was compelled to terminate parental rights unless the party objecting established one of the exceptions found in section 366.26, subdivision (c). Counsel for G.H. stated that her client did not oppose allowing the adoption of the younger siblings to go forward. Counsel for Father contended the sibling exception precluded termination of parental rights, and that there was no evidence G.H. would be allowed to visit her siblings or would continue to have contact with them if they were adopted. Counsel for DCFS noted that the siblings had visited in the recent past, and that the caregivers for the three children -- all paternal relatives -- had agreed to ensure they visited regularly

6

in the future. The court, noting that the interests of Santino and Molly were paramount, pointed out that G.H. had been removed from the A's home because of her harmful conduct toward her younger siblings. The court then found by clear and convincing evidence that Santino and Molly were adoptable, and terminated parental rights over them.[7] Father appealed.

## DISCUSSION

"The court has four choices at the [section 366.26] permanency planning hearing. In order of preference the choices are: (1) terminate parental rights and order that the child be placed for adoption . . . ; (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care. (§ 366.26, subd. (b).)" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) "Whenever the court finds 'that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.' (§ 366.26, subd. (c)(1).)" (*Ibid.*) Adoption is the first choice because ""it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.""" (*In re C.B.* (2010) 190 Cal.App.4th 102, 122.)

Once it is determined that the child is adoptable, a parent seeking a different plan "has the burden of showing that the termination of parental rights would be detrimental under one of the exceptions listed in section 366.26, subdivision (c)(1)(B). [Citation.]" (*In re J.C.* (2014) 226 Cal.App.4th 503, 528.)[8] The sibling exception at issue here is found in section 366.26, subdivision (c)(1)(B)(v), which provides: "[T]he court shall terminate parental right unless . . . There would be

---

[7]    At the request of the children's counsel, the court renewed the order for twice monthly sibling visitation.

[8]    There is no dispute that Santino and Molly were adoptable.

7

substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."

The parent espousing the sibling exception must establish the existence of a strong sibling relationship, and demonstrate that its severance would be detrimental to the child for whom a permanent plan of adoption is being considered.[9] (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952.) "Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended." (*Ibid*.) Moreover, even if the sibling relationship is so strong that its severance would cause the child detriment, before applying the exception, the court must find the benefit of continuing that relationship outweighs the benefit to the child adoption would provide if parental rights are terminated. (*Id*. at pp. 952-953 [in considering whether to apply the sibling exception, "the court is directed first to determine whether terminating parental rights would substantially interfere with the sibling relationship by evaluating the nature and extent of the relationship, including whether the child and sibling were raised in the same house, shared significant common experiences or have existing close and strong bonds. [Citation.] If the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by

---

[9]     Courts have uniformly held that parents have standing to assert the sibling exception. (See, e.g., *In re L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 948-951; *In re J.T.* (2011) 195 Cal.App.4th 707, 719.)

the permanency of adoption. [Citation.]"].) Accordingly, application of the sibling relationship exception will be rare, "particularly when the proceedings concern a young child . . . whose need for a competent, attentive and caring parent is paramount." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 593; accord, *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)

"'[T]he language [of the statute] focuses exclusively on the benefits and burdens to the adoptive child, not the other siblings.'" (*In re Celine R.*, *supra*, 31 Cal.4th at p. 54, quoting *In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) Thus, a juvenile court may not derail an adoption "that is in the adoptive child's best interest because of the possible effect the adoption may have on a sibling." (*In re Celine R.*, *supra*, at p. 54.) The court should "carefully consider all evidence regarding the sibling relationship as it relates to possible detriment to the adoptive child," including "[a] nonadoptive sibling's emotional resistance towards the proposed adoption," as it may be "indirect evidence of the effect the adoption may have on the adoptive child." (*Id*. at p. 55.) "But the ultimate question is whether adoption would be detrimental to the adoptive child, not someone else." (*Ibid*.)

Here, the court declined Father's invitation to find that the sibling exception applied and implicitly found that the prospect of interfering with the younger children's relationship with G.H. would not cause detriment to them outweighing the benefits of a permanent, adoptive home. (See *In re A.A.* (2008) 167 Cal.App.4th 1292, 1321 [where party raised statutory exception to termination, juvenile court need not address it by express finding; "when the trial court issues a termination order, the appellate court will assume, in the absence of a contrary indication in the record, that the trial court considered the question of detriment and will imply, from the entry of a termination order, a negative finding on the question of detriment"].) Substantial evidence supported that finding. Santino and Molly were very young -- three and less than two -- when these proceedings began.

9

Even prior to DCFS's involvement, G.H. had been living apart from them due to her parents' separation. Initially, DCFS placed the three children together -- first with a foster family and then with paternal cousins, the A.'s. But that arrangement ended in April 2014, because G.H.'s presence was harmful to the younger siblings; by the time of the February 4, 2015 hearing, the two younger children had been living apart from G.H. for many months without evidence of any detriment to them. Although G.H. was initially unhappy about the adoption and feared losing contact with her siblings, by the time of the February 4 hearing, she was living with another paternal relative, visitation was taking place, and both sets of relatives promised regular visitation in the future. This record does not support the existence of a sibling relationship outweighing the benefits of adoption to Santino and Molly. Even if it did, the prospective adoptive parents' and legal guardian's expressed intention to maintain contact between the adoptive and nonadoptive siblings meant no interference was likely. (See *In re Jacob S*. (2002) 104 Cal.App.4th 1011, 1019, disapproved on another ground in *In re S.B*. (2009) 46 Cal.4th 529 [where extended family members seeking to adopt two of five children expressed intent to maintain ties with siblings, court found no evidence sibling relationship would cease upon termination of parental rights]; *In re Valerie A.*, *supra*, 152 Cal.App.4th at p. 1014 [court could not ignore "practical realities of the extended family's circumstances in considering whether termination of parental rights would substantially interfere with the sibling relationships" where extended family member seeking to adopt younger siblings was willing to continue contact with older sibling]; *In re Daisy D*. (2006) 144 Cal.App.4th 287, 293 [no evidence that adoption by paternal grandparents would interfere with minor's relationship with half-siblings where grandparents intended to maintain contact].)

Father contends the court erred in failing to continue the hearing under the standards set forth in *In re Salvador M*. (2005) 133 Cal.App.4th 1415 and *In re*

10

*B.D.* (2008) 159 Cal.App.4th 1218.  In *In re Salvador M*., the appellate court found speculative the juvenile court's conclusion that interference with the "existing close and strong bond" between two brothers would not result from freeing the younger sibling for adoption, because the grandmother who was the guardian of the older brother was the most likely candidate to adopt the younger brother, although her home study was not complete.  (133 Cal.App.4th at pp. 1419, 1422.)  The Court of Appeal explained that where the siblings had a close bond and adoption by a nonfamily member was likely to interfere with that relationship, "the better procedure for the juvenile court to have followed . . . would have been to continue the hearing until the grandmother's home study had been completed."  (*Ibid*.)  In *In re B.D*., the same appellate court expressed skepticism that substantial evidence supported the juvenile court's finding at the section 366.26 hearing that five siblings -- all between the ages of three and ten and some with significant disabilities -- were adoptable as a unit, where DCFS had been unable to find a placement willing to take them as a group and no specific family had expressed interest in adopting all of them.  (159 Cal.App.4th at pp. 1222-1224, 1236.)  The court stated that "where there are tentative alternative plans" for the children, and "one plan may substantially interfere with the sibling relationship," the "better approach is to continue the [section 366.26] hearing until the uncertainty has been resolved.  [Citation.]"  (*Id*. at p. 1236.)  Father contends the siblings' situation was equally tenuous here because the plan to place G.H. in a guardianship with the paternal aunt was faltering at the time of the February 4 hearing, and while the A.'s were committed to adopting the younger siblings, their home study was not yet completed.

Preliminarily, we note that the statements concerning the "better approach" and the "proper procedure" on which Father relies constituted dicta.  In both cases, while the appeal was pending, the juvenile courts' prognostications came true:  in

*In re B.D.*, an adoptive home was found to take all five children, and in *In re Salvador M.*, the grandmother's home study was approved. Accordingly, in both cases, the lower court rulings were affirmed. Something similar has occurred here. While this appeal was pending, we took judicial notice of the April 7, 2015 order naming the paternal aunt as G.H.'s legal guardian. Thus, the more tenuous of the prospective permanent plans for the siblings -- G.H.'s placement -- has been resolved. The court's implicit finding that Santino and Molly would be adopted by paternal relatives who would support continuing the sibling connection was not speculative. At the time of the February 4 hearing, Santino and Molly had been with the A.'s for two years -- most of their young lives -- and were bonded to them and thriving in their home. It was unlikely that the court would remove them. Finally, the cases are distinguishable because here, the court implicitly found -- and the evidence supports -- no strong sibling connection from the perspective of Santino and Molly, and no detriment to them exceeding the benefits of being in a stable home if the connection were severed. It follows that the court was under no obligation to continue the hearing to ensure that the tentative permanent plans for the children would become permanent prior to terminating parental rights over the younger children.

## DISPOSITION

The order terminating parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

EPSTEIN, P. J.

COLLINS, J.

13