Filed 4/27/23  In re Z.B. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re Z.B. et al., Persons Coming Under the Juvenile Court Law. | C095624 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br>          Plaintiff and Respondent,<br><br>     v.<br><br>T.B.,<br>          Defendant and Appellant;<br><br>B.B.,<br>          Appellant. | (Super. Ct. No. STK-JD-DP-2020-0000143) |
| In re Z.B., a Person Coming Under the Juvenile Court Law. | C095625 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br>          Plaintiff and Respondent,<br><br>     v.<br><br>T.B.,<br>          Defendant;<br>R.B.,<br>          Intervener and Appellant. | (Super. Ct. No. STK-JD-DP-2020-0000143) |

1

These consolidated dependency matters involve claims by various parties challenging the juvenile court's orders denying placement of Z.B. (the minor) with the maternal grandfather. (Welf. & Inst. Code, §§ 361.3, 395.)[1]

In both cases, appellants T.B. (mother) and maternal grandfather R.B. (grandfather) contend the juvenile court erred by failing to consider the requirements set forth in section 361.3. In case No. C095624, appellant B.B. (the minor's half sibling), who lived with the maternal grandfather, contends the court abused its discretion in making its placement findings when it failed to consider the sibling relationship as required by sections 361.3 and 366, subdivision (a). The San Joaquin County Human Services Agency (Agency) counters that mother lacks standing to challenge the court's placement order, and in any event, the court did not abuse its discretion in denying placement with grandfather, a decision which was supported by substantial evidence.

Finding appellants' claims lack merit, we will affirm the juvenile court's orders.

BACKGROUND

Because the cases have been consolidated, the background reflects a summary of combined factual and procedural history from both cases as follows.

In May 2020, the Agency learned of problems between mother and eight-year-old B.B., whose biological father was reportedly incarcerated. B.B. lived with the minor, mother, and mother's boyfriend, but she had been staying with mother's friend because mother was threatening to drop her off at a children's shelter. B.B. reported that mother verbally and physically abused her and told her and others that she "does not want [B.B.] anymore." B.B. was taken into protective custody and placed with grandfather. The social worker informed the shelter that background checks for grandfather and his wife

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

had been cleared by the Department of Justice and child protective services, and a home assessment regarding B.B. was scheduled for grandfather.

On May 20, 2020, the Agency filed a dependency petition pursuant to section 300, subdivisions (b), (c), (g), and (j) on behalf of B.B., and subdivisions (b), (g), and (j) on behalf of the minor (then four months old). The petition alleged mother used methamphetamine at the time of B.B.'s birth, and that she had relapsed and was using methamphetamine and marijuana. The juvenile court sustained the allegations in the petition (as amended in court), took jurisdiction over B.B. and the minor, ordered the minor removed from parental custody, and ordered supervised visitation and drug court for mother.

When the minor was removed from mother's custody, the Agency asked grandfather about accepting placement. Given his surgery and ongoing chemotherapy treatment for pancreatic cancer, grandfather declined.

The Agency reported that mother wanted the minor returned but did not want to reunify with B.B. By February 2021, mother had disavowed B.B. entirely, wanting nothing to do with the child and choosing to reunify only with the minor. Mother was reportedly using substances again and failed to follow through with counseling and mental health treatment for B.B.

In April 2021, and again in May 2021, F.H., father of three of the minor's half siblings, and his wife C.H. (the H. family) came forward and inquired about placement of both B.B. and the minor. However, B.B. had already been placed with grandfather and his wife and the minor was placed in a foster home. Grandfather and his wife were struggling with some of B.B.'s behaviors and working with a community support group to maintain placement of the child. The minor had been placed on an emergency basis with a family friend. However, after approximately five months, the family friend no longer wanted to care for or provide permanency for the minor and gave notice. The minor was then removed and placed in a foster home.

The Agency reported that, while it was appropriate to maintain a sibling relationship, the minor and B.B. were not placed together because they were not removed at the same time, and because grandfather and his wife were not willing to take the minor into their home. Grandfather and his wife were, however, willing to visit with the minor and have sibling visits in their home. However, they had ongoing concerns about B.B.'s behavioral issues and their own age and health issues and were still deciding whether they wanted to provide any form of long-term care for B.B.

At the contested disposition hearing on April 21, 2021, the court bypassed mother for reunification services and reduced her visitation to one time per week.

On July 7, 2021, the court heard arguments regarding F.H.'s request for placement of the minor in his home. The Agency informed the court that, in early June 2021, the minor had been in a stable foster placement when her caretaker unexpectedly died. The Agape Villages Foster Family Agency (FFA) social worker discovered the caretaker had passed away when he went to pick up the minor for her visit with mother. Because it was a Friday afternoon and it was unknown how long the minor had been in the home with her deceased caretaker, it was urgent that the minor be immediately placed with certified caretakers. Thus, the FFA immediately placed the minor with her new caretakers "under respite conditions." When the Agency became aware of the caretaker's death one week later, the Agency social worker immediately scheduled child family team (CFT) meetings to discuss relative placement. In the June 2021 and July 2021 CFT meetings, grandfather and his wife stated they wanted the minor to be placed with and adopted by F.H. and his family, the H. family. The minor's present caretaker, however, expressed concern regarding the minor's emotional dysregulation following visits with the H. family.

The Agency argued in favor of placement with the H. family. It argued the minor's emotional dysregulation following visits with them was due to the minor's unexpected transition to a new foster home following the death of her previous caretaker. Minor's counsel objected to placement of the minor with the H. family because the three

4

H. family half siblings continued to have a relationship and unsupervised contact with mother, who posed a risk to the minor. The minor's counsel also objected to moving the minor at all given the traumatic event the child recently experienced with the unexpected passing of her caretaker. Counsel noted the minor was settling into her new placement and was doing well and it would be detrimental to move her.

The Agency disagreed and argued it would not be detrimental to move the minor from her present caretaker, having been placed there for just three weeks "due to a respite emergency situation" (i.e., the unexpected death of the foster parent), and it would be better for the minor to be with relatives such as the H. family. Minor's counsel countered that there was no relative placement preference given that the case was postdisposition, the minor was in a concurrent home, and there was no need to move her. Counsel argued further that the minor, who was only one and a half years old, was not raised in the same household as the H. family half siblings and was likely not as bonded to those children as they were to her. The court ordered increased visitation between the minor and the H. family siblings to determine the nature and extent of any connection between the children.

On August 25, 2021, the Agency reported that B.B. was doing well in the care of grandfather and his wife, and was closely bonded to and wanted to continue visits with the minor. The Agency reiterated that the minor had not been placed with B.B. because grandfather and his wife had indicated they were not in a position to take the minor into their home. It was also noted again that grandfather and his wife had not yet decided whether they wanted to establish some form of long-term care or permanency of B.B.

At the August 25, 2021 review hearing, the Agency reported receipt of a relative information form filed by the maternal grandmother raising "significant concerns" regarding the appropriateness of the H. family home for placement of the minor, including that F.H. had previously been in a long-term relationship with mother during which mother and F.H. both used drugs and were involved in domestic violence and F.H.

5

repeatedly allowed mother to be in the presence of the minor in violation of the court's order. The Agency was initially not inclined to believe the statements made by the maternal grandmother and was still confident in the eventual plan to move the minor to the H. family home. However, as the resource family approval process (RFA) continued, the Agency gathered information that tended to support the concerns raised by the maternal grandmother and, as a result, the Agency determined in October 2021 that the H. family would no longer be considered for placement. The Agency noted the current caretaker was willing to be a concurrent home for the minor and was committed to maintaining a relationship between the minor and the half siblings going forward so there was no need to move the minor.

Mother objected to the maternal grandmother's unsworn statements, claiming the grandmother was estranged from the rest of the family. Mother argued that, when the minor's prior foster mother passed away, the Agency should have placed the minor with a relative or a nonrelated extended family member, but instead placed the minor with a nonrelated foster caretaker. Mother stated she intended to submit a voluntary relinquishment of her parental rights over the minor to the H. family and, in the event that failed, to grandfather who already had custody of B.B. The Agency argued it would reject mother's voluntary relinquishment as to the H. family and would not provide an approved adoptive home study for the family, both of which would be required for a relinquishment. Mother requested a placement hearing and asserted that grandfather was now willing to take the minor and was already RFA approved. The court instructed mother to file an appropriate motion.

On September 2, 2021, the maternal grandmother filed a second relative information form setting forth her concerns regarding the Agency's plan to place the minor with grandfather and his wife, including that grandfather and his wife could not agree on whether to take permanent placement of B.B., let alone the minor, grandfather

6

had admitted his poor health, and grandfather could not be trusted to keep the minor away from mother.

In September 2021, the Agency reported that the minor had been placed with her current caretaker under respite conditions after her previous foster mother passed away unexpectedly. F.H. was approved for placement and the H. family wanted to adopt both the minor and B.B. in order to ensure the sibling bond between them remained intact.

The Agency reported that the minor appeared to be comfortable with grandfather and his wife, and that grandfather was now requesting that the minor be placed with them so that the minor and B.B. could grow up together. The two children reportedly had an "undeniable bond." The Agency stated it was appropriate to maintain the relationships between the minor and all of her half siblings, including the H. family half siblings. However, the Agency was not willing to place the minor with the H. family given the concerns raised by the maternal grandmother, and the fact that assessment of grandfather's home was underway, and the Agency was awaiting the court's determination at the upcoming placement hearing.

On September 7, 2021, mother filed a motion for change of placement of the minor together with the supporting declaration of grandfather. Mother argued it was in the minor's best interest to be placed and raised with her siblings, whether that be in the home of grandfather or the H. family. Grandfather made some of these same arguments in his declaration, as well as his responses to a number of the claims and accusations lodged by the maternal grandmother in her relative information forms. Finally, grandfather asserted that B.B. wanted to live and grow up with the minor and he and his wife could and would provide a safe, stable, permanent home for both children.

At the September 7, 2021 review hearing, B.B. requested to be heard in chambers, where she informed the court of her desire to be placed with the minor in the home of the H. family. The court adopted the Agency's recommended findings, including that B.B.'s current placement with grandfather was appropriate.

7

In its October 2021 report, the Agency reported that grandfather and his wife were no longer being considered for placement given issues grandfather and his wife were having with B.B., which would be exacerbated by adding the minor to the household, and given the Agency's suspicions that grandfather would allow mother unsupervised access to the minor. The Agency further reported that, while the minor's extended family clearly loved her, the minor was thriving, stable, and bonded with her current caretakers who were providing for her physical and emotional needs and were willing to adopt her. The Agency was in the process of assessing the minor's foster family for prospective adoption. The minor continued to visit with her half siblings, grandfather, and the H. family, all of whom she recognized and enjoyed. The Agency recommended termination of parental rights with a permanent plan of adoption.

The initial section 366.26 hearing on October 13, 2021, was preceded by a continued placement hearing. The Agency informed the court that the H. family had withdrawn their request for placement after learning their RFA application would be denied. Mother's counsel stated the minor's caretakers were willing to adopt the minor but were unwilling to adopt B.B. The court continued the hearing and, subsequent thereto, found the minor's caretakers to be de facto parents.

At the December 17, 2021 continued placement hearing, mother's counsel informed the court that grandfather and his wife wanted placement of the minor, but that mother would nevertheless consent to placement with the minor's current caretakers if the minor and B.B. were placed there together. The Agency declined to consent to mother's offer unless ordered to do so by the court, stating it would place undue pressure on the caretakers. The Agency also noted it continued to have concerns regarding B.B.'s "tenuous" placement with grandfather and his potential inability to keep B.B. long term. The court continued the placement hearing and trailed the section 366.26 hearing.

In January 2022, the Agency reported the minor's biological father, R.M. (father), who had recently become a participant in the proceedings, had indicated he did not have

8

the desire or the financial means to care for the minor and waived his right to participate in further dependency proceedings. Mother objected to adoption by a nonrelative and again requested that the minor be placed with grandfather. Visits between the minor and her half siblings were arranged by the minor's caretakers, the H. family, and grandfather in the hopes that such arrangement would continue even if the minor were adopted by her caretakers, who continued to express their commitment to maintaining the sibling relationships, as well as the relationship between the minor and the grandparents postadoption.

On January 12, 2022, mother filed a supplemental brief again requesting placement of the minor with grandfather. Mother argued grandfather should have been considered for placement in June 2021 when the minor's placement changed due to the unexpected death of her caretaker. She further argued she had repeatedly offered to voluntarily relinquish her parental rights to grandfather, who she argued was ready, willing, and able to provide permanency for the minor and B.B.

At the January 14, 2022 continued placement hearing, the Agency informed the court of its opposition to mother's request to place the minor with grandfather. Social worker Luz Mayorga testified that the minor required a new placement in June 2021 due to the unexpected passing of her foster mother. While it was the Agency's normal practice to assess relatives and nonrelatives for placement, the Agency did not consider grandfather for placement at that time because the FFA handled the emergency placement of the minor. Mayorga did not learn about the caretaker's death until after the minor had been in the home of the new caretakers for one week. Mayorga did not know why the FFA did not consider grandfather or any other relative for placement at the time of the emergency removal. She opined that, given B.B.'s placement in grandfather's home, grandfather should have been assessed for emergency placement. However, when Mayorga learned about the death of the caretaker, she did convene a CFT meeting to discuss relative placement. The FFA social worker, the new caretakers, mother,

9

grandfather, and the maternal grandmother all participated. At that time, grandfather wanted the minor placed with the H. family and it was the Agency's intention to do so, however, the minor's counsel objected based on the maternal grandmother's statements of concerns.

Mayorga testified further that the Agency normally attempted to place siblings together but grandfather declined placement after the death of the caretaker and, by the time he requested placement and was RFA approved, there were concerns about suspected emotional abuse of B.B. in grandfather's home as well as marital difficulties between grandfather and his wife, who were reportedly "on [the] verge of a divorce" because grandfather's wife did not want the minor placed in their home. Those concerns arose shortly after B.B.'s placement with grandfather, whose wife believed it was only a temporary placement. Mayorga also testified that the Agency did not accept mother's offer to execute a voluntary relinquishment of her parental rights over the minor to grandfather because of those concerns and the Agency feared that placing the minor in grandfather's home would do nothing to alleviate the existing problems and would place the minor in a "dysfunctional household."

Mayorga further testified that the minor had a bond with her current caretakers, referring to her foster parents as "mom" and "daddy," often seeking them out, and wanting to be held or carried by them. The Agency felt it was neither appropriate nor in the minor's best interest to place the minor with grandfather because the minor was bonded to her caretakers and not grandfather or his wife and this would be the minor's fourth placement. Mayorga stated that, during visits between the minor and grandfather and his wife, the minor usually sought out B.B. for care and comfort rather than grandfather or his wife. Mayorga opined that the minor was doing well with her caretakers and the behavioral concerns she initially had were no longer present.

Grandfather confirmed he initially declined placement of the minor because he was recovering from cancer surgery and chemotherapy, but he stated he was now fully

recovered and his cancer was in remission. He denied using illegal substances as alleged by the maternal grandmother. He testified his relationship with mother (his daughter) was strained due to the way mother emotionally abused B.B., and he stated he never allowed mother to have unsupervised contact with B.B. Grandfather testified that he did not request placement of the minor at the June 2021 CFT meeting because it was his view that the minor and B.B. should be placed with the H. family. However, once the H. family withdrew from the RFA process, he told the social worker he was willing to adopt both B.B. and the minor. He testified his wife was not initially on board with adopting both B.B. and the minor, but after having a serious discussion in October 2021 and completing all of the required classes, she was. He was RFA approved for B.B. Grandfather testified he was now able to care for and provide for the minor and protect the minor from mother. His wife was also willing to adopt the minor and B.B. He denied any domestic violence with his wife or any emotional abuse of B.B. by his wife.

Mother testified she wanted the minor and B.B. to be placed together and she was willing to relinquish her parental rights to either the current caretakers or grandfather with that proviso. The parties stipulated that B.B. would testify she wanted to live with the minor and she felt safe in the home of grandfather and his wife. After hearing argument, the court took the matter under submission.

On January 21, 2022, the court denied mother's motion for change of placement, ordered that the minor remain with her current caretakers, and confirmed the matter for a contested section 366.26 hearing.[2] Case No. C095625 became fully briefed on January 3, 2023, and case No. C095624 became fully briefed on February 6, 2023. The case was assigned to this panel shortly thereafter.

---

[2] Mother's request for judicial notice of reporter's transcripts from two postjudgment proceedings, filed February 3, 2023, is hereby denied.

DISCUSSION

Appellants contend the juvenile court abused its discretion in denying mother's request for placement of the minor with the grandfather by failing to apply the requirements of section 361.3, subdivision (a), including the requirement that the court consider the nature and extent of the sibling relationship.

In determining where to place a child removed from the physical custody of his or her parents, preferential consideration is given to relatives. A "relative" is defined as "an adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship." (§ 361.3, subds. (a), (c)(2); see also § 319, subd. (h)(2).) " 'Section 361.3 gives "preferential consideration" to a relative's request for placement, which means "that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).)' [Citation.] 'When considering whether to place the child with a relative, the juvenile court must apply the [section 361.3] placement factors, and any other relevant factors, and exercise its independent judgment concerning the relative's request for placement.' [Citation.]" (*In re A.K.* (2017) 12 Cal.App.5th 492, 498; accord *In re Isabella G.* (2016) 246 Cal.App.4th 708, 719.) Placement with a relative is neither required nor guaranteed. (§ 16519.5, subd. (c)(6).)

We review a juvenile court's determination regarding relative placement pursuant to section 361.3 for abuse of discretion. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) "[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling." (*Ibid.*) "Broad deference must be shown to the trial judge. The reviewing court should interfere only ' "if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did." ' " (*Ibid.*)

Mother and grandfather claim the court did not analyze its placement decision pursuant to section 361.3 as required. The Agency argues mother lacks standing to challenge the juvenile court's placement order and, in any event, the court did not abuse

12

its discretion in denying placement with grandfather. As we will explain, we agree with the Agency.

*Standing*

Standing to raise a particular issue on appeal depends on whether the person's rights were injuriously affected by the judgment or order appealed from. (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1034-1035; accord, *In re Vanessa Z.* (1994) 23 Cal.App.4th 258, 261.) A person does not have standing to urge errors on appeal that affect only the interests of others. (*In re Gary P.* (1995) 40 Cal.App.4th 875, 877.) Accordingly, a parent is precluded from raising issues on appeal that do not affect his or her own rights. (*In re Jasmine J.* (1996) 46 Cal.App.4th 1802, 1806; *In re J.T.* (2011) 195 Cal.App.4th 707, 717-718.)

In dependency proceedings, a parent's interest is in reunification and in maintaining a parent-child relationship. (See *In re Devin M.* (1997) 58 Cal.App.4th 1538, 1541.) While reunification efforts are ongoing, parents generally have standing on appeal to raise issues concerning relative placement. (*In re Baby Girl D.* (1989) 208 Cal.App.3d 1489, 1493.) However, when reunification is no longer being pursued, a parent is not aggrieved by placement determinations. Thus, the court in *Cesar V.* held that "a parent does not have standing to raise relative placement issues on appeal, where the parent's reunification services have been terminated. (*Cesar V.* [*v. Superior Court*], *supra*, 91 Cal.App.4th at p. 1035.) This is because decisions concerning placement of the child do not affect the parent's interest in reunification, where the parent is no longer able to reunify with the child." (*In re A.K.*, *supra*, 12 Cal.App.5th at p. 499; see *In re Isaiah S.* (2016) 5 Cal.App.5th 428, 435-436.)

Here, the juvenile court denied reunification services to mother at the contested disposition hearing on April 21, 2021. The placement hearing commenced on January 14 and 21, 2022. Because reunification services had been denied long ago, she had no interest in the possible future placement of the minor, whether that be with the

grandfather or anyone else. Having failed to establish that her rights and interests were injuriously affected by placement of the minor with her foster caretakers, mother lacks standing to raise the alleged error on appeal.

*Merits of Claim*

Assuming without deciding that grandfather and B.B. have standing, we turn to the merits of their claims and conclude that the court did not abuse its discretion in denying the request to place the minor with grandfather.

Grandfather contends the Agency failed to assess him for placement when the minor was initially taken into protective custody, then again when the minor's foster mother passed away, and then once again when he formally requested placement. He further contends the juvenile court conducted a placement hearing but failed to consider the section 361.3 factors and relied solely on the best interests of the minor. Grandfather claims the error was not harmless because a proper assessment would have revealed that the minor should have been placed with him. Similarly, B.B. claims the Agency failed to make any effort to place the minor and B.B. together, and the juvenile court failed to conduct any meaningful discussion regarding the nature of the minor's relationship with B.B. The record belies the claims of both grandfather and B.B.

Grandfather's complaints that the Agency improperly failed to assess him for placement when the minor was removed, and again when the previous caretaker died, are baseless. When the minor was removed in May 2020, grandfather was asked if he was interested in placement of the minor and he affirmatively declined placement at that time due to his recovery from cancer surgery and chemotherapy. The minor was briefly placed with a family friend and then moved to a foster home. After the foster mother unexpectedly died in early June 2021, leaving the minor alone in the home with the decedent for an unknown period of time, the FFA reacted to the trauma suffered by the minor by quickly placing her in an emergency placement with a new, certified foster family, now the de facto parents. As soon as the Agency became aware of the

14

circumstances, the social worker convened a CFT meeting to explore possible relative placement. At that June 2021 CFT meeting, grandfather and his wife again declined placement stating it was their wish that the minor be placed with the H. family. Thus, it is plain that grandfather declined placement when the minor was first removed and again when emergency placement was made after the unexpected death of the minor's previous caretaker. Therefore, his claims fail in that respect.

Even thereafter, grandfather did not directly notify the juvenile court or the Agency of a change of his position or his newfound desire for placement. Instead, he did so in his declaration attached to the motion to change placement filed by mother on September 7, 2021. However, it was not until October 2021 that, according to grandfather, his wife finally agreed to placement of the minor and adoption of both the minor and B.B. By that time, the minor was doing well and settling in with her caretakers.

Further, by the time grandfather changed his position and expressed a desire for placement, the Agency was no longer considering grandfather for placement due to various other concerns, some of which were raised by the maternal grandmother, such as grandfather's difficulty caring for B.B., uncertainty as to whether he would prohibit mother from having unsupervised access to the minor, and marital difficulties between grandfather and his wife, who believed the placement of B.B. was only temporary and who, as late as October 2021, was not agreeable to placement of the minor in their home.

Thereafter, the court held a placement hearing on January 14, 2022, at which the court considered the Agency's reports and heard testimony from several witnesses, including grandfather, mother, and social worker Mayorga. We reject grandfather's and B.B.'s contentions that the court did not consider the factors in section 361.3, as required.

"Subdivision (a) of section 361.3 lists a panoply of criteria which the agency and the court must consider when faced with a request for placement with a relative" (*In re Luke L.* (1996) 44 Cal.App.4th 670, 680), including the best interest of the child, the

15

wishes of the parent, relative and child, placement of siblings in the same home "unless that placement is found to be contrary to the safety and well-being of any of the siblings[]"; the good moral character of the relative and other adults living in the home, the nature and duration of the child's relationship with the relative, and the relative's desire and ability to provide legal permanency for the child if reunification is unsuccessful. (§ 361.3, subd. (a)(1)-(8); see *In re Luke L.*, at p. 680; *Samantha T. v. Superior Court* (2011) 197 Cal.App.4th 94, 111.)

Section 361.3, subdivision (e), provides that, "[i]f the court does not place the child with a relative who has been considered for placement pursuant to this section, the court shall state for the record the reasons placement with that relative was denied."

Here, after considering the Agency's reports and the testimony of the witnesses regarding the factors set forth in section 361.3, the juvenile court properly stated its reasons for denying placement of the minor with grandfather. In particular, the court acknowledged its duty to analyze "fairness elements" as well as "the best interest of the child" in making a placement determination. In that regard, the court noted that the minor had experienced "tremendous trauma" after the death of her foster mother, visits between the minor and grandfather "were limited in number," and the number of the minor's previous placement changes, as well as the fact that the minor was now "undergoing some peace" and had some stability in her current placement with the de facto parents. The court concluded it was not in the minor's best interest to be moved to a new placement. " 'The overriding concern of dependency proceedings . . . is not the interest of extended family members but the interest of the child,' whose bond with a foster parent may require that placement with a relative be rejected. [Citation.]" (*In re J.Y.* (2022) 76 Cal.App.5th 473, 486.) In other words, "[t]he linchpin of a section 361.3 analysis is whether placement with a relative is in the best interests of the minor." (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 862-863.) Here, the court determined it was not.

Viewing the evidence in the light most favorable to the juvenile court's order (*In re Caden C.* (2021) 11 Cal.5th 614, 640-641), the evidence established that: It was not in the minor's best interest to be placed with grandfather based on the concerns set forth in detail in the background section of this opinion and given that the minor was bonded to her caretakers but not to grandfather or his wife; the minor's relationships with her half siblings should be maintained but she should not be placed with some or all of her half siblings because that would require placement with either grandfather or the H. family; both placements had been ruled out as not in the minor's best interest; there were no character concerns regarding the de facto parents; while there were no outright character issues with grandfather and his wife, there were continuing concerns about placement in their home, namely the concern that grandfather's wife had emotionally abused B.B. and was not until recently in agreement that the minor be placed in the home; the minor's relationship with grandfather and his wife was limited to contact when the minor was a baby prior to removal and occasional visits after removal; the de facto parents wanted to provide permanency; while the minor's relationship with the de facto parents was only six months old, the minor was bonded to her foster parents and called them "mom" and "daddy" and was comfortable and settled in their home; the ability of grandfather and his wife to provide an appropriate home was questionable given the continuing concerns about the "tenuous" placement and care of B.B. and the wife's reluctance to bring the minor into her home; both grandfather and the de facto parents were able to facilitate visitation between the siblings but there was some concern that grandfather might also permit mother to have contact with the minor against court orders; the home of the de facto parents was safe while the safety of grandfather's home was questionable given some of the concerns previously discussed. (§ 361.3, subd. (a)(1)-(8).)

On this record, it is apparent the juvenile court considered the factors set forth in section 361.3, along with the documentary and testamentary evidence provided, and found that placement with grandfather was not in the minor's best interest, even though

half sibling B.B. was currently placed with him.  We find no abuse of discretion.  (*In re Robert L.*, *supra*, 21 Cal.App.4th at p. 1067.)

DISPOSITION

The juvenile court's orders are affirmed.


/s/_____<br>BOULWARE EURIE, J.


We concur:


____/s/_____
RENNER, Acting P. J.


____/s/_____
EARL, J.