Filed 8/21/23  In re C.M. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re C.M. et al., Persons Coming Under the Juvenile Court Law. | C096570 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>E.M. et al.,<br><br>Defendants and Appellants. | (Super. Ct. Nos. JD241904, JD241905, JD241906, JD241907, JD241908) |

Appellants E.M. (father) and J.S. (mother), parents of the minors, appeal from the juvenile court's June 29, 2022 orders.  (Welf. & Inst. Code,[1] § 395.)  The parents contend

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

the allegations of sexual abuse in the dependency petition were not supported by substantial evidence.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Father and mother are the parents of the five minors, C.M., En.M., G.M., J.M., and M.M. (minors), who at the time the original petition was filed were aged 10, 12, 14, 15, and 17, respectively.  Four adult children also lived in the parents' home at that time: E.M., Jr.; Mag.; Mar.; and R.M.

I

*Initial Interactions With The Minors, The Adult Siblings, And The Parents*

The family came to the attention of the Sacramento County Department of Child, Family and Adult Services (Department) in December 2021 when the eldest minor, M.M., ran away from her parents' home to the home of her adult half sister, E.G., and reported that for the last nine months, father had been touching her breasts and vagina and had "dry-humped" her several times.  M.M. also reported that mother knew about father's actions but did nothing to intervene because mother was afraid of father and was controlled by him.  E.G. reported she too had been sexually abused by father when she was seven years old but that she kept the abuse to herself and never told anyone about it.  M.M. told the social worker that when mother and adult brother E.M., Jr., had confronted father in the presence of the other minors, mother cried and said she was willing to kick father out of the house and call the police, but nothing came of it.

The social worker interviewed the other four minors who generally stated both parents were good parents and denied being afraid of anyone or being inappropriately touched by anyone in the home.

The social worker interviewed the parents, who claimed M.M. left for work one day and never returned or called to let them know she would be staying with E.G.  Mother claimed M.M. was angry because she was not allowed to date and was required to share chores with the other minors in the home.  The parents claimed there were

2

conflicts regarding M.M.'s boyfriend. Both parents agreed to allow M.M. to remain with E.G. until the investigation was complete.

On February 4, 2022, E.G. reported that the court granted M.M.'s request for a three-year domestic violence restraining order against father. E.G. stated M.M. was doing well but had contact with mother and her other siblings, and her other siblings were pressuring her to return home.

On April 1, 2022, M.M. informed the social worker she had spoken with her sisters by phone and they were pressuring her to return home. However, she felt safe with E.G. and wished to remain in her care. M.M. felt father was controlling and manipulating mother and the other minors, and never allowed them to be alone.

On April 11, 2022, the Department filed dependency petitions on behalf of M.M. and the other four minors pursuant to section 300, subdivision (d), alleging sexual abuse of M.M. by father, substantial risk of sexual abuse of the other minors by father, and failure of mother to protect the minors from father's sexual abuse. The four remaining minors were eventually removed from the parents' home and placed in protective custody.

At the relative placement hearing on April 20, 2022, the parties informed the juvenile court that the remaining four minors (who were all older than ten years old) were exposed to physical violence in their placements and wished to be returned home. With mother's promise to keep father out of the house, and the fact that there were adult siblings in the home, the juvenile court ordered the four minors returned to mother's custody.

II

*April 27, 2022 Interview Of M.M.*

On April 27, 2022, the social worker interviewed M.M. privately. M.M. affirmed that her previous allegations were "all true." She described some of father's conduct, including that he took showers with the two adult siblings, he had a sexual relationship

with adult sibling Mar., he made the female minors massage his entire body daily, and he sometimes slept with Mar. or R.M. in a trailer outside the house. M.M. reported that mother once walked in on Mar. performing oral sex on father.

M.M. reported that in the beginning of 2021, father broke her bed and she had to start sleeping with him on the living room floor. Father would make her massage him until everyone was asleep. M.M. further reported that in March of 2021, father began making her sleep with him in the trailer. M.M. would pretend to be asleep and feel father "dry humping" her, and she would wake to find his hands or mouth on her breasts or her vagina. Father also placed his penis against her vagina. M.M. also reported that mother knew but would only confront father when she was drunk. M.M. stated that adult sibling E.M., Jr., once attempted to confront father saying, "You think we don't know what the fuck you're doing making [M.M.] sleep with you!" A fight between E.M., Jr., and father ensued and father beat up E.M., Jr. M.M. noted that father hit everyone in the home and "whacks us everywhere." She recalled a time when father "socked" her in the face and bruised her eye because she was massaging him wrong or doing it with an attitude. M.M. provided the social worker with a picture of the black eye she received from father.

M.M. further reported that father manipulated and threatened her and that the "whole family covers up for him." She stated that all the children in the family were coached on what to say so that their stories matched, and were taught to pretend everything was fine or just "play dumb." M.M. stated she had not spoken with her adult sibling, E.G., for years until E.G. came into the grocery store where M.M. worked and the two began talking. M.M. told E.G. that father had been touching her inappropriately and E.G. offered to take M.M. with her to keep M.M. safe from father. M.M. stated she felt safer with E.G. than she had ever been.

4

## III

### *April 28, 2022 Interview Of E.G.*

The social worker spoke with E.G. on April 28, 2022.  E.G. stated she had been sexually abused as a child by father and, as a result of her disclosures about that abuse, her relationships with mother and her half siblings (the five minors and the adult siblings) were severed.  E.G. stated she ran into M.M. at the grocery store and M.M. told her, "No matter what the rest of the family thinks, I believe everything you said."  E.G. stated that, after several visits at the grocery store, M.M. began to open up.  On the day of M.M.'s initial disclosures, E.G. noticed M.M. looked sad and asked if she was okay.  When M.M. shook her head no, E.G. asked if father had touched her, to which M.M. responded, "Yes."  According to E.G., M.M. also disclosed that father was physically abusive toward everyone in the home.  M.M. went with E.G. to E.G.'s home.  Once there, E.G. contacted the maternal aunt who told E.G. to call the police.  When law enforcement officers and Child Protective Services (CPS) arrived, E.G. encouraged M.M. to "tell them everything."  Thereafter, the parents came to E.G.'s home in an unsuccessful attempt to convince M.M. to return home.  E.G. said that when the parents were leaving, E.G. overheard and recorded mother telling M.M., "I know what he did was wrong, but I'll kick him out or get a restraining order—whatever you want."

## IV

### *May 9, 2022 Interview Of M.M.*

M.M. sent the social worker a text message on May 9, 2022, stating, "Hey, can I talk to you just by myself you don't have to call [E.G.] just call me because I have a lot I want to say."  The social worker called and M.M. said, "I want to confess that I lied," and stated she wanted to come clean about lying because things had "gone too far" and she "heard the little girls got taken away to foster care and they cried everyday [*sic*] and now they're talking about taking my dad to jail for a very long time."  When the social worker

asked if they could meet in person, M.M. agreed but said she did not want E.G. to know about the meeting.

The following day, M.M. met the social worker at a local park where M.M. reiterated that she wanted to recant because things had gone too far. She said, "The reason I said those things about my dad was because I was mad at him for telling me to clean my room." She also said, "I just wanted to go to work and do what I wanted to do. I didn't want to help around the house." The social worker asked M.M. if her prior disclosures were true that she and her siblings massaged father all over his body, the two adult female siblings showered with father, and M.M. slept with father. M.M. stated they were not and said, "I feel really bad for all of this because my dad really is the best dad ever. I feel bad for doing this to him. No one can replace my dad." She claimed she made the prior allegations because she was mad and E.G. encouraged her to "tell them more." M.M. claimed E.G. made her "say all those things" and told her she "needed to say more in order for anyone to believe [her], so [she] just kept saying more stuff." M.M. stated she no longer felt safe in E.G.'s home and she "knew for a fact that [E.G.] lied" about being sexually molested by father as a child.

When asked to describe how E.G. became involved, M.M. explained that she was working at the grocery store when E.G. came into the store and they struck up a conversation after not communicating for years. During a subsequent trip to the grocery store, E.G. noticed M.M. was upset and asked if everything was okay. M.M. said father had made her clean her room and do her homework that day, making her late for work. So when E.G. asked, "Did dad touch you," M.M. said yes because she was angry with father. E.G. called law enforcement and, when the officer arrived with the emergency response social worker, M.M. told them father touched her. When E.G. encouraged her to tell them more, M.M. "started saying more and more stuff . . . because [she] wanted to make it believable." M.M. stated she just wanted it all to be over, she did not want to live with E.G. any longer, and she wanted to go home. The social worker informed M.M. that

6

she would request an alternate placement but could not return the minor home as there was a restraining order in place and an active investigation pending. M.M. decided she would be safe with E.G. so long as no one informed E.G. about the recantation. When asked what would happen if E.G. found out, M.M. said, "I don't know but I know she'll get mad."

Approximately one week later, M.M. sent text messages to the social worker stating she had been locked out of E.G.'s home, she was at the hospital, and she did not want to remain at E.G.'s home because did not feel safe.

E.G. contacted the social worker several times in early May 2022 to report that M.M. was having regular contact with her siblings via social media and video calls and had, on May 7, 2022, left with adult sibling R.M. On May 10, 2022, E.G. informed the social worker that she was no longer comfortable providing care for M.M., as M.M. was being disrespectful and dishonest and spending a good deal of time away from the home. E.G. stated she loved M.M. but could not keep trying to help her if she did not want the help. E.G. requested a meeting to discuss alternate placement for M.M.

On May 18, 2022, E.G. reported that M.M. had left after an argument with E.G. and after leaving E.G. a disrespectful note. The following day, E.G. reported that CPS referrals had been opened against her by M.M., who claimed E.G. failed to take her for medical care when she was sick and that E.G. physically abused her by slamming the door on her foot. E.G. noted that M.M. had been sneaking alcohol in the home and that E.G. had recently learned M.M. had "a serious drinking problem."

The social worker received a call from the maternal aunt, who confirmed that father had been physically abusive towards mother since the two were young. The maternal aunt reported that mother always returned to father after the abuse because he apologized and spoke nicely to her. The maternal aunt was certain mother would leave father for good after mother caught father sexually abusing Mar. but, instead, mother went back to him. According to the maternal aunt, mother brought Mar. to the maternal

7

aunt's home for approximately three months, leaving the other children at home with father. During that period, mother disclosed to several family members what she witnessed between father and Mar. Mother also disclosed her belief that father touched R.M. as well. However, father started coming around and apologizing and eventually mother returned home with Mar.

On May 23, 2022, M.M. left E.G.'s home and returned to mother's house. As of June 1, 2022, M.M. was refusing to leave the family home and not allowing the social worker to see her. The Department recommended the juvenile court sustain the allegations in the petitions, declare the minors dependents of the juvenile court, and provide both parents with reunification services.

On June 1, 2022, the juvenile court ordered mother to release M.M. to the Department for appropriate placement. After repeated efforts, the social worker was finally able to meet with mother to formulate a safety plan. However, the family was not cooperative with the Department's attempts to determine the family's adherence to the plan. The Department concluded that, without mother's cooperation, there were no services available to maintain the minors in mother's care and custody or to ensure their safety.

On June 22, 2022, the Department filed amended petitions alleging the minors fell within section 300, subdivisions (b) and (d). In particular, it was alleged that mother failed to protect the minors from abuse by father and there was a substantial risk that the minors would be sexually abused by father in light of father's sexual abuse of M.M.

At the jurisdiction/disposition hearing, the juvenile court dismissed the original petitions as superseded by the amended petitions. M.M. testified she told E.G. that father touched her but then told E.G. it did not happen in the car on the way to E.G.'s home and E.G. called law enforcement officials anyway. She claimed E.G. and the maternal aunt told her to add more lies so it would be more believable. She further claimed that the social worker wrote things down that were false and wrote things down she did not say,

8

including the disclosure about father molesting her, oral sex between father and Mar., the two adult female siblings showering with father, massaging father's thighs, mother drinking all day and allowing the abuse to happen, father physically abusing everyone, and father "sock[ing M.M.] in the face."

On June 29, 2022, after spending considerable time reading the reports and the transcript of M.M.'s testimony, the juvenile court concluded that M.M.'s "first version of events is more likely than not to be true than the second version." The juvenile court issued its 12-page ruling, striking the section 300, subdivision (b)(1) allegations as to mother on its own motion, sustaining the subdivision (d) allegations as to father, and returning all five minors to mother's custody.

## DISCUSSION

### I

### *Standing*

Mother contends she has standing to appeal the juvenile court's order sustaining the section 300, subdivision (d) allegations as to father. She claims, without any analysis or citation to the record, that the jurisdictional findings were prejudicial to her because a finding against one parent (here, father) is also good as to the other parent (here, mother) (*In re Briana V.* (2015) 236 Cal.App.4th 297, 308), her interests and father's interests " ' "interweave" ' " and she has standing to litigate " ' "issues that have a[n] impact upon the related interests" ' " (*In re Caitlin B.* (2000) 78 Cal.App.4th 1190, 1193, citing *In re Patricia E.* (1985) 174 Cal.App.3d 1, 6), "standing should be construed liberally" (*In re K.C.* (2011) 52 Cal.4th 232, 236), and "fundamental fairness and justice require that [she] have standing" (*In re C.W.* (2019) 33 Cal.App.5th 835, 867).

The Department argues mother has not established that she was aggrieved by the juvenile court's jurisdictional rulings and therefore she does not have standing to appeal from the challenged order. (*In re J.T.* (2011) 195 Cal.App.4th 707, 717.) As we shall explain, mother lacks standing to assert her challenge on appeal.

9

" 'Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal. [Citations.]' [Citation.] Thus, '[a] parent cannot raise issues on appeal [that] do not affect his or her own rights.' [Citations.]" (*In re Jayden M.* (2014) 228 Cal.App.4th 1452, 1459.) "To be aggrieved, a party must have a legally cognizable interest that is injuriously affected by the court's decision. [Citation.] The injury must be immediate and substantial, and not nominal or remote." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 948.) "An appellant must show prejudicial error affecting his or her interest in order to prevail on appeal." (*In re Vanessa Z.* (1994) 23 Cal.App.4th 258, 261.)

Here, the juvenile court dismissed all allegations against mother, ordered that M.M. and the other four minors be placed with her, and further ordered that she be provided with family maintenance services. In dependency proceedings, a parent's interest is in reunification and in maintaining a parent-child relationship. (*In re Devin M.* (1997) 58 Cal.App.4th 1538, 1541.) Mother has been reunified with the minors. Due to her lack of analysis and failure to refer to the record, she has not demonstrated that assertion of the juvenile court's jurisdiction against father adversely affects her. As such, mother lacks standing to raise the issues on appeal.

II

*Substantial Evidence Supports The Section 300 Subdivision (d) Allegations*

In joining mother's claim, father contends there was insufficient evidence to support the allegations under section 300, subdivision (d) because there was no basis to believe M.M.'s initial report of sexual abuse. As we will explain, the claim lacks merit.

" 'Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by [s]ection 300' who may be adjudged a dependent of the court." (*In re I.C.* (2018) 4 Cal.5th 869, 876.) We review this finding for substantial evidence. (*Id.* at p. 892.) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the [juvenile] court; we

review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the [juvenile] court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) If supported by substantial evidence, the judgment or finding must be upheld, even though substantial evidence may also exist that would support a contrary judgment and the juvenile court might have reached a different conclusion had it determined the facts and weighed credibility differently. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

As relevant here, section 300 provides that a child comes within the jurisdiction of the juvenile court if "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused . . . by the child's parent." (§ 300, subd. (d).)

The juvenile court found M.M.'s disclosures regarding father's sexual abuse to be credible. M.M. disclosed to E.G. that father inappropriately touched her. She described how her conversation with E.G. came about and how the subject of inappropriate touching arose. M.M.'s description of the initial disclosures was consistent with E.G.'s account. Additionally, E.G. reported that, when the parents arrived at her home in an unsuccessful attempt to convince M.M. to return home, E.G. overheard mother say, "I know what he did was wrong, but I'll kick him out or get a restraining order—whatever you want." The social worker also stated mother confirmed having told M.M. she was willing to obtain a restraining order and kick father out of the home.

The juvenile court also found M.M. gave the social worker "an extremely detailed account" of the sexual abuse perpetrated by father. That account included that father broke her bed and she had to start sleeping with him on the living room floor or in the trailer. Father made M.M. massage him until others in the household were asleep and he would "dry hump" her, put his hands or mouth on her breasts, put his hands or mouth on her vagina, and place his penis against her vagina. M.M.'s disclosure to the social worker also included information regarding father's sexual abuse of adult sibling Mar. "Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the

11

inferences to be drawn from evidence are the domain of the [juvenile] court." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) We do not second guess the juvenile court's credibility findings.

In joining mother's claim, father claims M.M.'s initial disclosures were not believable because they were made in the context of her discontent with the family rules, a problematic relationship with her boyfriend, and a wish to live free of parental control. On the contrary, the juvenile court found M.M.'s original disclosures to be compelling but her recantation not credible and her justification for recanting not believable. As the juvenile court noted, M.M.'s original disclosures were "extremely detailed." Their credibility was buttressed by the fact that M.M. chose to stay at E.G.'s house, and she stated she felt safer with E.G. than she had ever felt.

Further, the juvenile court did not find credible M.M.'s explanation that she took the drastic step of accusing father of sexual abuse simply because father made her late to her job, particularly when she had been late before and she suffered no consequence for her tardiness on this occasion. She went from accusing her father of sexual abuse of her and her siblings to stating father "is the best dad ever." M.M. also testified, contrary to her previous statements, that she told E.G. that father touched her inappropriately but then told E.G. that was not true on the drive to E.G.'s house. Yet, despite the alleged admission in the car, M.M. chose to stay with E.G. and agreed to call the police to report the abuse.

In joining mother's claim, father claims that, whereas M.M.'s initial disclosures were made under the influence of E.G., her recantation was unequivocal, freely given, and not prompted by others. The record suggests otherwise. After M.M. made her initial disclosures, she affirmed to the social worker that those allegations were "all true." Before recanting, M.M. stated she was feeling pressured by her parents and siblings, and she revealed that the other children in the home were routinely coached to "pretend everything was fine" or "play dumb." When she did recant, she said she heard her

12

younger siblings were in foster care crying every day and father might go to jail "for a very long time." And, while she claimed no one pressured her but E.G., it was noted that she repeatedly said, "Mom told me," during a heated argument with E.G., suggesting she was indeed receiving information from mother and her siblings. She also testified she accused father of sexual abuse because she just wanted to do what she wanted to do and "do [her] own thing," language almost identical to that used by mother and several of the other minors when asked why M.M. might have accused father.

Finally, in joining mother's claim, father claims M.M.'s initial report of sexual abuse was uncorroborated by anyone, including the other minors living in the same home. As a preliminary matter, it is axiomatic that evidence from the minor alone was sufficient to support a jurisdictional finding. (*In re Alexis E.*, *supra*, 171 Cal.App.4th 438, 450-451.) In any event, while it is not surprising there was no firsthand witness corroboration of father's sexual abuse of M.M., she disclosed the sexual abuse by father to E.G., the maternal aunt, and the social worker. And there was corroborative evidence that father had sexually abused at least two of M.M.'s adult siblings, E.G. and Mar. E.G. disclosed that she had been sexually abused by father when she was a child and had been cut off from the family as a result of those claims. The maternal aunt informed the social worker that mother had previously caught father in the act of sexually abusing Mar. and that mother and Mar. left home and stayed with the maternal aunt for three months. The maternal aunt also stated mother disclosed the sexual abuse to several family members during that time.

Considering the evidence in the light most favorable to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the juvenile court's ruling (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545), there was sufficient evidence to support the juvenile court's finding that M.M. "has been sexually abused, or there is a substantial risk that the child will be sexually abused . . . by the child's parent" (§ 300, subd. (d)).

13

DISPOSITION

The juvenile court's orders are affirmed.


/s/
ROBIE, J.


We concur:


/s/
HULL, Acting P. J.


/s/
HORST, J.*

---

\*      Judge of the Placer County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.